CHARLES E. MAY, APPELLANT, V. CITY OF KEARNEY ET AL.,
APPELLEES.
CONSUMERS PUBLIC POWER DISTRICT, APPELLANT, V. CITY
OF KEARNEY ET AL., APPELLEES.
17 N. W. 2d 448

FILED JANUARY 23, 1945.   Nos. 31837, 31838.

476

*Clarence A. Davis, William W. Redmond* and *Paul E. Boslaugh,* for appellants.

*Kenneth H. Dryden* and *H. L. Blackledge, contra.*

*Max Kier* and *A. A. Whitworth, amici curiæ.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

CHAPPELL, J.

Plaintiffs Charles E. May and Consumers Public Power District filed separate amended petitions in the district court for Buffalo county, Nebraska, to permanently enjoin defendant City of Kearney and its officials from issuing bonds for the purpose of raising money to tender an award made by a court of condemnation in proceedings brought by the city against plaintiff Consumers Public Power District as provided by section 70-650, R. S. 1943, and chapter 19, art. 7, R. S. 1943, wherein the city sought to acquire the electric light and power plant and distribution system serving the inhabitants of the city but belonging to the district. Plaintiff Charles E. May, a resident, legally qualified voter and taxpayer of the city of Kearney for more than ten years, and a user of electricity supplied by the district, and two other equally qualified persons petitioned for an injunction on behalf of themselves and all others similarly situated. The two cases were consolidated for trial in the district court and decision by this court. After hearing upon the merits the trial court denied an injunction and dismissed plaintiffs' separate amended petitions. Plaintiffs,

Charles E. May, hereinafter called May, and Consumers Public Power District, hereinafter called Consumers, appeal to this court, contending: (1) That the bonds proposed to be issued and sold are invalid as in violation of section 18-412, R. S. 1943, in that they pledge and hypothecate the revenue and earnings of the electric light and power plant without the approval of a majority of the electors voting upon the proposal submitted; (2) that by reason of certain representations, promises and pledges made by the mayor and city council to the electorate during the election upon the question of acquisition of the property the city is estopped to issue general obligation bonds as it claims the right to do under the provisions of section 19-704, R. S. 1943; and (3) that chapter 19, art. 7, R. S. 1943, and section 70-650, R. S. 1943, in so far as it incorporates chapter 19, art. 7, R. S. 1943, into its provisions, are unconstitutional for the reason that the act deprives the owner of his property without due process of law, there being no provision therein for notice and hearing upon the question of the legality of the preliminary steps taken by the city in the condemnation proceedings and there being no provision therein for a judicial hearing on the matter of just compensation. It is also claimed by plaintiffs that chapter 19, art. 7, R. S. 1943, is unconstitutional in that it is class legislation, and violates the doctrine of the separation of powers. We conclude that plaintiffs' first two contentions have merit, but that the statutes involved are constitutional.

Preliminary to a decision of plaintiffs' first contention we find it necessary to recite some pertinent facts. The record discloses that on March 2, 1942, the city council passed an ordinance providing for submission to the qualified electors at the next regular city election the question whether the city of Kearney, which did not then own any electric light and power plant, should acquire the system owned by Consumers by use of procedure provided in chapter 19, art. 7, R. S. 1943. The electorate of the city approved the proposal by a majority of 27 votes. The result was duly certified to this court and three district judges were appointed as a court

of condemnation. The court of condemnation had a hearing and entered an award fixing the value of Consumers' property at $276,975. It is to tender this amount and secure possession of the system pending an appeal by Consumers that the city seeks to issue and sell bonds which are the subject of this suit. The value having been thus determined by the award of the court of condemnation the city council enacted an ordinance providing for submission to the electorate of the question whether the city should have the power and authority to issue and sell revenue bonds and use the proceeds therefrom for the purpose of paying the costs of acquiring the property. At the election thereon this proposition was defeated by a majority of 560 votes, after which the city council canvassed the election and declared the proposition lost. Nevertheless, and despite this clear expression of the electorate, the city council enacted an ordinance which provided for the issue and sale of the bonds here involved.

Defendant city asserts that Consumers as condemnee cannot challenge the proceedings by which funds are raised or attack the validity of the bonds, its only concern being to receive the money to which it is lawfully entitled for the property. The applicable rule has been stated in *Central Power Co. v. Nebraska City,* 8 Cir., 112 Fed. 2d 471, by use of the following language: "The laws of Nebraska make adequate provision for the raising of money by cities to pay for property acquired under condemnation and since the Company must receive its payment before the City can take possession, the Company may not in this proceeding question how the City is to obtain the money with which it will pay. See *Slocum v. City of North Platte,* 8 Cir., 192 F. 252; *Village of Oshkosh v. Fairbanks-Morse & Co.,* 8 Cir., 8 F. 2d 329." While we follow this rule and conclude that Consumers has no right to raise the question of the validity of the bonds, it is not disputed but conceded that plaintiff May, representing himself and all others similarly situated, does have a legal right to do so.

The city also contends that it has the power by virtue of

section 19-704, R. S. 1943, to issue and sell general obligation bonds and that the bonds authorized by the ordinance are valid as such. Whether the proposed bonds are valid or otherwise depends upon the wording of the bonds themselves, the history and provisions of applicable statutes and their interpretation by this court. The bonds themselves each, after acknowledging the city's indebtedness for their respective amounts and giving its promise to pay the same, contains the provision that, "For the prompt payment of this bond, principal and interest, when due, the full faith, credit, and resources of this city are hereby irrevocably pledged." They further provide: "The revenues and earnings derived and to be derived from the operation of the entire electric light and power plant acquired, owned and operated by the City, including the property acquired by eminent domain, and all extensions and additions thereto, and all improvements thereof hereafter made, are to be owned by the City, *and are pledged and hypothecated for the payment of said bonds; all bonds of said issue are equally and ratably secured by said pledge.* The City further agrees that it will cause to be levied and collected annually a tax on all the taxable property in the City by valuation sufficient in amount to make up any deficiency in the earnings of said plant and promptly pay the interest on said bonds as and when said interest becomes due, and to create a sinking fund to pay the principal of said bonds when said principal becomes due." (Italics supplied.)

It seems clear that the city is attempting to acquire an electric light and power plant and pay for it by the issue and sale of what is designated as negotiable obligation bonds for the payment of which the city has, without favorable vote of the electorate, pledged and hypothecated the revenues and earnings of the plant with the taxing power as collateral security. In other words, the city is attempting to do indirectly that which it cannot do directly.

Turning to the statutes involved and their interpretation, we find that the opinion of this court in *Interstate Power Co. v. City of Ainsworth,* 125 Neb. 419, 250 N. W. 649, dis-

tinguished *Christensen v. City of Fremont,* 45 Neb. 160, 63 N. W. 364, clarified *Carr v. Fenstermacher,* 119 Neb. 172, 228 N. W. 114, and gave judicial construction to both chapter 18, art. 1, Comp. St. 1929, now chapter 19, art. 14, R. S. 1943, and chapter 116, Laws 1931, now chapter 70, art. 5, R. S. 1943. In the *City of Ainsworth* case, *supra,* it was held: "1. * * * A municipal corporation is a creature of the law established for special purposes and its corporate acts must be authorized by its charter or other laws applicable thereto. 1 McQuillin, Municipal Corporations (2d ed.) sec. 367. * * * 3. * * * 'Where a certain power is conferred upon a municipality and the method of its exercise is prescribed, such method constitutes the measure of the power.' *Consumers Coal Co. v. City of Lincoln,* 109 Neb. 51. * * * 4. * * * Neither express nor implied power to purchase an electric light and power plant and pay for it by pledge of future net earnings therefrom is conferred on cities by chapter 116, Laws 1931. * * * 5. * * * Section 18-101, Comp. St. 1929, confers on cities of the second class power to purchase, construct, maintain and improve lighting systems. The succeeding section provides two methods for raising funds to pay for a heating or lighting plant, but does not provide any method of raising funds to maintain and improve the lighting plant." See, also, *Southern Nebraska Power Co. v. Village of Deshler,* 130 Neb. 598, 265 N. W. 880.

Chapter 19, art. 7, consisting of sections 19-701 to 19-707, inclusive, Comp. St. 1929, was enacted in 1919 and existent when *Interstate Power Co. v. City of Ainsworth, supra,* was decided. In 1941 these sections were repealed in their entirety but with the title extended, amended to include villages, and, supplemented with validity, savings and emergency clauses, they were immediately reenacted verbatim as theretofore and now appear as sections 19-701 to 19-707, inclusive, R. S. 1943. Section 19-704, R. S. 1943, relied upon by the city here, provides in part as follows: " * * * the city or village authorities, without vote of the people, shall have the power, if necessary, to issue and sell

bonds of the city or village to provide funds to make such tender." It will be noted that nothing appears in the act itself which permits the issue and sale of revenue bonds or pledging and hypothecating the revenue and earnings of the plant. The statute refers only to bonds of the city or village, meaning general obligation bonds of the city or village, precisely that and nothing else. The court indicated as much in *City of Mitchell v. Western Public Service Co.*, 124 Neb. 248, 246 N. W. 484.

But be that as it may, after the decisions in *Interstate Power Co. v. City of Ainsworth, supra,* and *City of Mitchell v. Western Public Service Co., supra,* the legislature of 1935 clarified the situation by enacting what is now section 18-412, R. S. 1943. It provides: "Supplemental to any existing law on the subject, and in lieu of the issuance of general obligation bonds, or the levy of taxes upon property, as by law provided, any city or village within the state of Nebraska may construct, purchase, or otherwise acquire, an electric light and power plant, * * * and real and personal property needed or useful in connection therewith, and pay the cost thereof by pledging and hypothecating the revenue and earnings of any electric light and power plant, * * * owned or to be owned by such city or village. In the exercise of the authority granted in this section, any such city or village may issue and sell revenue bonds or debentures and enter into such contracts in connection therewith as may be proper and necessary. Such revenue bonds or debentures shall be a lien only upon the revenues and earnings of the electric light and power plant, * * * owned or to be owned by such city or village. *No city or village shall pledge or hypothecate the revenue and earnings of any electric light and power plant, * * * nor issue revenue bonds or debentures, as authorized by this section, until the proposition relating thereto has been submitted in the usual manner to the qualified electors of such city or village at a general or special election and approved by a majority of the electors voting on the proposition submitted; * * * .* The requirement herein of a vote of the electors, however,

shall not apply when a city or village seeks to pledge or hypothecate such revenue and earnings, or issue revenue bonds or debentures, solely for the maintenance, extension or enlargement of any electric light and power plant, * * * owned by such city or village." (Italics supplied).

Clearly these several acts and decisions heretofore discussed are all related and form an integrated whole of the law from which we arrive at decision upon the first question presented here. In the case at bar the language of the bonds themselves clearly and unequivocally pledges and hypothecates the revenue and earnings of the plant in the very language of the statute which prohibits it, and in direct contravention of the legislative power conferred, since it was done after a substantial majority of the qualified electors of the city voting thereon had at an election disapproved and defeated the proposal when lawfully submitted.

We find no authority in the statute or other precedent supporting the validity of the bonds proposed to be issued. We can only conclude for the reasons heretofore stated that they are invalid. In such a case the applicable rule is that, "When bonds or other evidences of indebtedness are about to be issued by public officers illegally or without complying with the statute authorizing their issue, equity has jurisdiction to grant an injunction, * * * . Where the law requires that the question shall be submitted to popular vote, an issue of bonds without such a vote will be enjoined." 32 C. J., sec. 421, p. 268. See, also, *Cook v. City of Beatrice*, 32 Neb. 80, 48 N. W. 828.

A declaration of invalidity of the proposed bonds for the reasons above stated, however, does not give plaintiff May all of the relief to which he is equitably entitled or completely determine the issues involved since in any event the city still claims the right to issue general obligation bonds as permitted by section 19-704, R. S. 1943, and will do so unless restrained by the court. In view of this situation we find it necessary to determine whether or not because of certain representations, promises and pledges made by the mayor and city council the city is now estopped from issu-

ing general obligation bonds. In this connection we cannot conclude from the evidence that the representations, promises and pledges were fraudulently made and do not so find but it is undisputed that they were made to the electorate of the city of Kearney as an inducement to a favorable result which was attained in the original election to acquire the property. We do not here intend to pass upon the validity of the election itself to carry out the purposes for which it was represented to be held but confine this part of the opinion to the question of whether the city is now estopped from doing that which its mayor and city council solemnly promised and pledged the electorate they would not do. In doing this we are mindful that recently by combination of the law and the electorate public ownership of more and more of the facilities of production have been effected for public purposes and the control of large economic forces have thereby been, and are being, placed in the control of public officials. To preserve self government public officials in charge of, or in obtaining control of, such large public financial and economic operations must be held to strict accountability for promises and pledges made to the electorate who under the law and by their votes confer these powers upon them, in order that the electorate may cast an intelligent ballot and protect their personal and property rights.

The record here discloses that the election upon the question of whether Kearney should purchase Consumers' property was held on April 7, 1942. The mayor testified that some time prior to the election he and a group of men being affirmatively interested had banded themselves together as interested Kearney citizens who desired to acquire Consumers' property for the good of the city of Kearney and its citizens. He testified that they held several meetings which were attended by himself, several members of the council and others to talk over and perfect plans to successfully carry the election. When asked to recall the names of the persons attending these meetings he was able to name but one man who was not either a member of the city council

or the board of public works. These persons each donated to a common fund to pay for radio time, newspaper advertisements and other necessary expenses of the project. They prepared and checked the advertisements and radio programs and approved the language in them. The mayor personally appeared upon the prepared radio programs. He testified that it was the sense of the council after discussion among themselves that they should by these advertisements and programs let the people know what the views of the mayor and city council were concerning the proposal, and that their views were as expressed therein. True, these meetings were not officially held in the council chamber, they were not officially called meetings of the mayor and council, and no record was made of them as the official action of the council, but every promise and pledge made by them had the intended similitude of official conduct and by both precedent and subsequent official acts were given their acquiescence and approval.

On February 17, 1942, the mayor, who had then served as a member of the city council eight years and as mayor approximately three years, appeared with the city water commissioner on a prepared program over radio station KFGW to discuss and enlighten the people upon the question of whether the city of Kearney should purchase Consumers' power interests in that city. They were introduced as representing the city council. They were asked a number of previously prepared questions by two disinterested Kearney citizens. Some of these questions and answers are important here. For example: "(Q.) Is it the opinion of the Mayor, Council and Board of Public Works that Kearney should own its own electric distribution system? (A.) Yes, after an intensive study carried on for more than a year it has been concluded that it will be extremely advantages (advantageous) for the City of Kearney to own and operate its own electric distribution system. * * * (Q.) If the value of the electric distribution system, determined by the Court, is satisfactory to the Mayor, Council and Board of Public Works and they decide to buy the property how

will it be paid for? (A.) It is planned to issue revenue bonds to be paid out of the revenue earned from the operation of the system. (Q.) Are revenue bonds a direct lien upon real property of the City of Kearney? (A.) No, revenue bonds are not a direct lien upon real property. Revenue bonds and their interest are not paid out of taxes. (Q.) Would a general obligation bond issue be necessary to pay any part of the cost of this property? (A.) No it would not! We have been assured by our engineers and by reputable bond houses that the entire project can be financed by revenue bonds bearing low rates of interest; I might add that very reputable house of engineers have been engaged on this project * * * . (Q.) What is the reaction among the citizens and do you feel that they will be receptive to this proposition? (A.) As yet there has been very little talk about it but I do feel that people are very much interested, especially so since the proposition will be financed through revenue bonds and therefore will add nothing to our taxes." In closing the program the original question was repeated and it was again stated that the mayor and water commissioner represented the city council, of whom two disinterested persons had asked a number of questions which were prepared for them.

On March 28, 1942, a large newspaper advertisement appeared in the Kearney Hub, a daily newspaper published and circulated generally in the city of Kearney. Parts of it are important here. Across the top in large type appeared the question, "SHALL KEARNEY ACQUIRE ITS ELECTRIC DISTRIBUTION SYSTEM?" Thereafter in smaller type appeared the following: "WHAT HAS BEEN DONE Your Mayor and Council have called an election to submit to the voters the question of determining the fair value of the property by a court of appraisers * * * WHAT WILL BE DONE If you vote YES (x) for condemnation of the electric system in Kearney your MAYOR and COUNCIL will: 1. Attempt again to negotiate with Consumers for a fair and reasonable price. 2. If negotiations fail, the condemnation court will set a value on the property. 3.

If the price set by the court seems fair and reasonable the proposition of issuing revenue bonds for same will be submitted to the voters. 4. These Revenue Bonds, as required by law, are payable out of earnings from the system. 5. Absolutely not one cent will be added to your property or personal tax. This advertisement is published by authority of the Mayor and Council and paid for by interested Kearney citizens."

On April 6, 1942, another advertisement of large proportions was likewise published in the same newspaper. Parts of it are also important. In large type appeared these words: "THE ELECTRIC QUESTION SIMPLIFIED. Would you like to know what the courts say is a fair price for this property? *This is the only question which will be decided tomorrow!* Vote (x) yes * * * All other factors involved will be voted on at another election. Vote 'yes' to get this *disinterested* valuation. That is why we have courts. Hear Mayor Mattson tonight. 8:15 P. M. over KGFW This ad paid for by interested Kearney citizens."

On April 6, 1942, at 8:15 p. m., as above advertised, the mayor spoke on the question over radio station KGFW. He stated in part: "Then when the court establishes that fair price, the City Council have pledged themselves to again submit to the voters to see if they want to pay it. This silly propaganda that 'You are handing your Council a blank check' or that 'They don't need another election, but will go right ahead and buy it' should not be talk of intelligent people. What's wrong? Is there no honor among men any more? I promise you as long as I am your Mayor we will stand by our promise. * * * Remember this, that all we are doing in tomorrow's election is to ask the courts to set a fair price. *When that price is determined, the people of Kearney will be given full opportunity to decide in another election whether or not they want to pay it. If you at that second election decide to take it over, it will be paid for through revenue bonds.* For the information of some not acquainted with the term, a 'revenue bond' is a bond issued against the earnings of the system. These bonds will all be paid out of the earnings of our electric system, and not

one cent will be added to your taxes."

As heretofore stated, the next day the electorate voted favorably on the proposition thus submitted to them by a majority of 27 votes; the result was certified to this court; and three district judges were appointed as a court of condemnation, who, after hearing, entered an award from which Consumers took an appeal to the district court. On April 6, 1943, the city council by appropriate official resolution submitted to the electorate, as they had previously promised and pledged themselves to do, the proposition of whether the council should have the power and be authorized to issue revenue bonds (as provided in section 18-412, R. S. 1943) for the purpose of tendering and paying the award. This proposition was defeated at the election by a majority of 560 votes.

Thereafter on September 7, 1943, the city council, in violation of its previous promises and pledges, authorized by ordinance the issue of what it calls "general obligation bonds" for payment of which they pledged both the full faith and credit and resources of the city, and, contrary to law and in violation of the will of the people, pledged and hypothecated the revenues and earnings of the plant and agreed to annually levy a tax on all the taxable property in the city sufficient in amount to make up any deficiency in the earnings of the plant necessary to promptly pay the interest and create a sinking fund to pay the principal when it becomes due.

On September 8, 1943, the then mayor vetoed the ordinance, his first reason given therefor being, "The City Administration which promoted this condemnation originally, pledged to the voters of Kearney if they voted to condemn the electric distribution system in Kearney they would proceed to do ONE thing—have the price determined; that if the system were ever purchased by the City it would be paid for by REVENUE BONDS (not general obligation bonds) and that the city administration would not issue bonds until the people voted to do so. The voters were permitted to vote on the bond question last April and they de-

feated the bonds * * * . I cannot overlook the fact that the bonds were defeated in EACH of the four wards of the City. I can only understand from this vote that a substantial majority of the voters said not to issue bonds. I believe it to be the duty of the Mayor and Council in an issue of this kind to represent the people, regardless of their personal beliefs or pleasures." On September 20, 1943, the city council, with one member only dissenting, passed the ordinance over the mayor's veto.

Of course the general rule is that, "No member of a city council or the mayor * * * , each acting separately as an individual, can bind the city by a contractual obligation creatable only by official action of the city council, nor can any one of them ratify or reinstate a void city contract or estop the city from denying the validity thereof." *Helleberg v. City of Kearney*, 139 Neb. 413, 297 N. W. 672. However, such a situation is not presented here. Plaintiff May represents himself as a voter and taxpayer who brings the action for himself and all others similarly situated as provided in section 25-319, R. S. 1943. Therefore, he represents both himself and the public, the electorate and taxpayers of the city of Kearney. As we view it consideration must be given to the entire transaction or proceeding to acquire and pay for Consumers' property, and no part of such transaction or proceeding is or can be of itself decisive of the question of estoppel. Precedent official action followed by promises and pledges given in the similitude of authority and subsequently receiving official acquiescence and approval is decisive of the question of estoppel.

The general rule is that while ordinarily a municipality may not be estopped by unauthorized conduct, representations, promises or pledges of the officers, it may, within the limitation of its legal powers, be estopped by its official acquiescence in, and approval of, acts originally unauthorized. 31 C. J. S., sec. 142b, p. 419.

In *City of Grand Island v. Willis*, 142 Neb. 686, 7 N. W. 2d 457, this court placed its approval upon the following statement: "As a usual thing, the doctrine of equitable es-

toppel cannot be invoked against a municipal * * * corporation as to the exercise of governmental functions, but yet exceptions are to be made and where right and justice demand it, the doctrine will be held to apply, particularly where, as is true here, the controversy is between one class of the public as against another class." See *State v. Haid,* 328 Mo. 739, 747, 41 S. W. 2d 806, 808. It was held in *State ex rel. Cox v. McIlravy,* 105 Neb. 651, 181 N. W. 554, that, "The doctrine of estoppel *in pais* has application to municipal corporations, and city councils or public authorities will be estopped or not as justice and right may require." It was said in *People v. Thomas,* 361 Ill. 448, 198 N. E. 363: "The doctrine of estoppel may be invoked against a municipal corporation where there have been positive acts by the municipal officers which may have induced the action of a party and where it would be inequitable to permit the corporation to stultify itself by retracting what its officers had done, * * * ." In *Moran v. Commissioners of Miami County,* 2 Black 722, 17 L. Ed. 342, referring to the county, the court said: " * * * corporations are as strongly bound as individuals are to a careful adherence to truth in their dealings with mankind, and that they cannot by their representations or silence involve others in onerous engagements, and then defeat the calculations and claims their own conduct had superinduced."

Neither will it avail the city under the facts presented to contend that the promises and pledges of the mayor and city council concerned the future as distinguished from either the past or the present. In this connection the rule is that while the doctrine of estoppel by representation is ordinarily applicable only to representations as to facts either past or present, and not to representations or promises concerning the future, there are well recognized exceptions where to enforce the rule would perpetrate a fraud or cause injustice; and this doctrine of promissory estoppel has particular application when the representations relate to an intended abandonment of an existing right, and is made to influence others who have in fact been influenced

by it and substantial injustice will result unless the promise is enforced. 31 C. J. S., sec. 80, p. 289; 21 C. J., sec. 145, p. 1142.

In a broad sense "estoppel is a bar which precludes a person from denying the truth of a fact which has in contemplation of law become settled by the acts and proceedings of judicial or legislative officers, or by the act of the party himself, either by conventional writing or by representations, express or implied, *in pais.*" 31 C. J. S., sec. 1, p. 191.

" * * * the wisdom and justice of the principle of estoppel, especially estoppel *in pais*, * * * are generally recognized, the view being founded on principles of equity, morality, and justice, and in accord with good conscience, honesty, and reason; and, as such, the doctrine subserves its true purpose as a plain, practical, fair, and necessary rule of law." 31 C. J. S., sec. 3, p. 193.

"Equitable estoppels operate as effectually as technical estoppels. They cannot in the nature of things be subjected to fixed and settled rules of universal application, like legal estoppels, nor hampered by the narrow confines of a technical formula. So, while the attempted definitions of such an estoppel are numerous, few of them can be considered satisfactory, for the reason that an equitable estoppel rests largely on the facts and circumstances of the particular case, and consequently any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances. * * * The following, however, may be ventured as the sum of all cases: That a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon. Such an estoppel is founded on morality and justice, and especially concerns conscience and equity." 10 R. C. L., sec. 19, p. 689. See, also, 31 C. J. S., sec. 59, p. 236.

That the electorate taxpayers relied upon the promises and pledges made by the mayor and city council in the case

at bar may be and is inferred from the circumstances appearing in the evidence and need not be proved by direct evidence. 31 C. J. S., sec. 162, p. 458. And it cannot be gainsaid that inequitable consequences would result to them were estoppel not applied.

Finally, as this court said in *State ex rel. Cox v. McIlravy, supra,* "The doctrine of estoppel *in pais* is applicable, and simply used to promote justice, equity and fair dealing between the parties involved. It resolves itself into a question of justice and equity to prohibit fraud and inequity, and as a general rule, when equitable estoppel is once established by the evidence or the facts in a case, it operates as effectively as a deed or a record. It is the law that estoppel is commensurate with the thing represented and operates to put the party entitled to its benefits in the same position as if the thing represented were true."

Therefore, we are of the opinion that the circumstances appearing in the case at bar bring the city of Kearney squarely within the rules above stated, and we conclude that the city is estopped to issue general obligation bonds at this time, its right and power to proceed further and do so, being thereby invalidated until another election is held and other required steps are taken as provided in chapter 19, art. 7, R. S. 1943.

It is the contention of the appellants, however, that the condemnation statute, sections 19-701 to 19-707, inclusive, R. S. 1943, is unconstitutional and that the primary right relied upon in the instant case for the issuance of bonds by the city of Kearney is dependent upon the validity of this statute. While we have hereinbefore held that the bonds which the city proposed to issue are absolutely void for want of statutory authorization and irregularities occurring in the conduct of the municipal election at which they were purported to have been authorized, the question whether any valid bonds could be issued by the city in payment for the property here sought to be condemned is an issue properly raised. Whether the city of Kearney is powerless to proceed further or whether it may correct its proceed-

ings and properly acquire the property by condemnation hinges on the validity of the condemnation act under attack. A complete decision of the issues raised requires that constitutional objections to the questioned condemnation statute be finally determined.

The city contends that Consumers, having accepted the benefits and enjoyed the privileges afforded by section 70-705, R. S. 1943, is estopped to attack the contitutionality of the act under which it was organized and now exists. This contention is fully disposed of in *State ex rel. Johnson v. Consumers Public Power District*, 143 Neb. 753, 10 N. W. 2d 784, wherein it was held that "The mere fact that a corporation is organized under a statute does not estop it to deny the constitutionality of a provision of the statute which constitutes a distinct, separable legislative enactment, the elimination of which would leave in full force and effect the provisions under which the corporation was organized."

In determining questions of constitutionality the nature and form of the act become important. The length of the statute prevents any extensive quotation of its provisions. We will consequently summarize its contents to the extent necessary for the determination of the issues here involved.

The act conferred upon the city of Kearney, and other cities of its class, the power to acquire by eminent domain, after an affirmative vote of the electors, any electric light and power plant located or operating within such city. Upon the holding of an election authorizing the taking and acquiring of the property by the required vote, the city council is required to certify the result to the supreme court of the state. The supreme court is then required within thirty days thereafter to appoint three district judges from three of the judicial districts of the state who shall constitute a court of condemnation for the ascertainment and finding of the value of the plant, works or system. The condemnation court thus formed is empowered to require the giving of notice, the filing of pleadings, the taking of evidence, and to perform all the duties of condemnation com-

missioners in the ascertainment of the value of the property taken and in the making of an award therefor. The owners of the property are given the right of appeal to the district court, which appeal is required by the act to be tried and determined upon the pleadings, proceedings, and evidence embraced in the transcript of the proceedings in the condemnation court. Upon the hearing of such appeal in the district court, judgment shall be pronounced for the value of any such works, plant or system. Either party may appeal to the supreme court and upon final judgment being pronounced as to the value of the plant, works or system, the city council is directed to issue and sell the bonds of such city or village for the payment of such judgment without a further vote of the people.

The act does not provide for the institution of condemnation proceedings in a duly constituted court or confer the power upon such a court to determine both the legality of the taking and just compensation. This court has held on three occasions that the court of condemnation created by the act was not a court within the meaning of the Constitution. *In re Appraisement of Omaha Gas Plant,* 102 Neb. 782, 169 N. W. 725; *City of Mitchell v. Western Public Service Co.,* 124 Neb. 248, 246 N. W. 484; *In re Application of City of Sidney,* 144 Neb. 6, 12 N. W. 2d 104. While this court is committed to this view, the suggestion has been advanced that material considerations have been overlooked. It may be argued that the decision in *In re Appraisement of Omaha Gas Plant, supra,* was made under the provisions of the 1875 Consitution, at which time section 1, art. VI provided: "The judicial power of this state shall be vested in a supreme court, district courts, county courts, justices of the peace, police magistrates, and in such other courts inferior to the district courts as may be created by law for cities and incorporated towns."

The decision contained the following language: "The board thus constituted cannot be a 'court' under the Constitution of the state, since the legislature has no power to constitute courts other than those named in that instru-

ment, except 'courts inferior to the district courts' for cities and incorporated towns, and we are convinced that it was not its intention to exceed its authority in this respect." However, the effect of this decision is to hold that the condemnation court was not a court at all in the constitutional sense, not that it was a court inhibited by the Constitution. In 1920 this provision of the Constitution was amended to read as follows: "The judicial power of the state shall be vested in a supreme court, district courts, county courts, justices of the peace, and such other courts inferior to the supreme court as may be created by law * * * ." Const., art. V, sec. 1. It is true, of course, that the provision as amended empowered the legislature to create courts other than those designated, inferior to the supreme court. But such provision does not have the effect of creating any such courts *ipso facto*. The provision is in no sense of the word self-executing; the affirmative action of the legislature is required to give it effect. It might then be suggested that after the adoption of the 1920 Constitution the legislature in 1921 repealed the act in force when *In re Appraisement of Omaha Gas Plant, supra,* was decided and reenacted it in identical language. This evidences no intent on the part of the legislature to create a court in the constitutional sense. The reenactment of the statute in identical language indicates a legislative intent under all rules of statutory construction to adopt the interpretation which the supreme court of this state had previously placed upon it,—that it was a tribunal other than a court within the meaning of the Constitution. It might be well to note that the act was again repealed and reenacted in 1941, but we can see no way in which these subsequent acts of the legislature could be construed as the exercise of the power granted it when section 1, art. VI, was amended by the Constitution of 1920. We think the reenactment of the act in identical language in 1941 has the further effect of a legislative approval of the interpretation given the act in *In re Appraisement of Omaha Gas Plant, supra,* decided in 1918, and *City of Mitchell v. Western Public Service Co., supra,* decided in

1933. We think also that *In re Application of City of Sidney, supra,* decided in 1943 after the reenactment of the act in identical language in 1941, properly interprets the act, although the constitutional and legislative changes herein mentioned were not given consideration in that case. The condemnation court created by the statute under consideration fails to contain the elements necessary to constitute a court in the constitutional sense. The Michigan court in considering a similar question said:. "By courts, as the word is used in the constitution, we understand permanent organizations for the administration of justice, and not those special tribunals provided for by law, that are occasionally called into existence by particular exigencies, and that cease to exist with such exigencies." *Streeter v. Paton,* 7 Mich. 341. Another interesting opinion on the elements necessary to constitute a court is *Bank of the State v. Cooper,* 2 Yerger (Tenn.) 599. We adhere to our former holdings cited herein that the condemnation court created by the act is not a court in the constitutional sense in which the word is used.

Appellants contend that the act is unconstitutional for the further reason that it fails to provide the owner of the property a judicial hearing on the matter of just compensation. As we have heretofore stated, that act provides for a full hearing before the condemnation court, a tribunal lacking the elements of a judicial court. An appeal to the district court is provided for, the review being limited to the record made by the condemnation court. We think appellants are in error in assuming that a full and complete hearing on all phases of the valuation of and damages to property taken under the power of eminent domain must be had in a judicial court.

An authoritative text writer states the rule as follows: "In those states in which a jury is not required by the constitution in eminent domain proceedings, the owner is entitled to a hearing conducted in some fair and just manner before an impartial judicial tribunal, and a chance to put in evidence before such tribunal of the value of his proper-

ty and the amount that it has been damaged. The amount of compensation is a judicial question and cannot be decided by the legislature, but the nature and character of the tribunal is in the discretion of the legislature, and it may consist of a justice of the court sitting alone, or of any number of commissioners." 2 Nichols, Eminent Domain (2d ed.) sec. 341, p. 945.

In *United States v. Jones*, 109 U. S. 513, 3 S. Ct. 346, the court said: "The proceeding for the ascertainment of the value of the property and consequent compensation to be made, is merely an inquisition to establish a particular fact as a preliminary to the actual taking; and it may be prosecuted before commissioners or special boards or the courts, with or without the intervention of a jury, as the legislative power may designate. All that is required is that it shall be conducted in some fair and just manner, with opportunity to the owners of the property to present evidence as to its value, and to be heard thereon."

In *Long Island Water Supply Co. v. Brooklyn*, 166 U. S. 685, 17 S. Ct. 718, the court said: "Neither can it be said that there was not 'due process of law' in these condemnation proceedings. It is not essential that the assessment of damages be made by a jury. Such award may be made by commissioners, at least where there is provision for a review of their proceedings in the courts."

In *Backus v. Fort Street Union Depot Co.*, 169 U. S. 557, 569, 18 S. Ct. 445, the court said: "It is within the power of the State to provide that the amount shall be determined in the first instance by commissioners, subject to an appeal to the courts for trial in the ordinary way; or it may provide that the question shall be settled by a sheriff's jury, as it was constituted at common law, without the presence of a trial judge. These are questions of procedure which do not enter into or form the basis of fundamental right. All that is essential is that in some appropriate way, before some properly constituted tribunal, inquiry shall be made as to the amount of compensation, and when this has been provided there is that due process of law which is required

by the Federal Constitution. *Bauman v. Ross,* 167 U. S. 548, 593."

In *Crane v. Hahlo,* 258 U. S. 142, 42 S. Ct. 214, the court in discussing this subject said: "The right of the plaintiff in error to damages having been established by the decision in 221 N. Y. 283, *supra,* there remained only the problem of determining the amount of the award which should be made and the manner of making it, and the reference of such a question, especially in eminent domain proceedings, to a commission, or board, or sheriff's jury, or other non-judicial tribunal, was so common in England and in this country prior to the adoption of the Federal Constitution that it has been held repeatedly that it is a form of procedure within the power of the State to provide and that when opportunity to be heard is given it satisfies the requirements of due process of law, especially when, as in this case, a right of review in the courts is given. * * * No one has a vested right in any given mode of procedure * * * and so long as a substantial and efficient remedy remains or is provided due process of law is not denied by a legislative change. *Oshkosh Waterworks Co. v. Oshkosh,* 187 U. S. 437, 439."

In *Missouri ex rel. Hurwitz v. North,* 271 U. S. 40, 46 S. Ct. 384, the general rule was stated in the following language: "It has been so often pointed out in the opinions of this Court that the Fourteenth Amendment is concerned with the substance and not with the forms of procedure, as to make unnecessary any extended discussion of the question here presented. The due process clause does not guarantee to a citizen of a State any particular form or method of state procedure. Its requirements are satisfied if he has reasonable notice, and reasonable opportunity to be heard and to present his claim or defence, due regard being had to the nature of the proceedings and the character of the rights which may be affected by it."

In *State ex rel. Oregon R. & N. Co. v. Fairchild,* 224 U. S. 510, 32 S. Ct. 535, the precise point raised by appellants is discussed in the following language: "Having been given

full opportunity to be heard on the issues made by the complaint and answer, and as to the reasonableness of the proposed order and having adopted the statutory method of review, this company cannot complain. It had the right to offer all competent testimony before the Commission, which, in view of the form of proceedings authorized by the statute, acted in this respect somewhat like a master in chancery who has been required to take testimony and report his findings of fact and conclusions of law. The court would test its correctness by the evidence submitted to the master. Nor would there be any impairment of the right to a judicial review, because additional testimony could not be submitted to the chancellor. The statute enlarges what this court has recognized to be proper practice in equity cases attacking such regulations. There the hearing is *de novo* and there is no prohibition in equity against offering all competent evidence to prove that the order was unreasonable. But in *Cinn., N. O. & Tex. Pac. v. I. C. C.*, 162 U. S. 184, 196, it was said: 'We think this a proper occasion to express disapproval of such a method of procedure on the part of the railroad companies as should lead them to withhold the larger part of their evidence from the Commission, and first adduce it in the Circuit Court. * * * The theory of the act evidently is, as shown by the provision that the findings of the Commission shall be regarded as *prima facie* evidence, that the facts of the case are to be disclosed before the commission.' See also *Texas & Pacific v. I. C. C.*, 162 U. S. 197, 238, 239; *Missouri &c. Ry. v. I. C. C.*, 164 Fed. Rep. 645, 649."

It seems to us that the hearing provided before the court of condemnation with a right of review in the courts on the record, meets all the requirements of due process in the fixing of the compensation in a condemnation proceeding. An impartial tribunal has been established to determine the compensation, notice to the interested parties is provided for, an opportunity to be heard is afforded and an appeal to the courts provided. This, under all the decisions, constitutes due process. It must be borne in mind that due proc-

ess is not necessarily judicial process. *Reetz v. Michigan,* 188 U. S. 505, 23 S. Ct. 390; *United States v. Ju Toy,* 198 U. S. 253, 25 S. Ct. 644. Nor does the fact that the act requires the court on appeal to decide the case upon the evidence adduced before the condemnation court constitute a want of due process. *Ross v. Board of Supervisors,* 128 Ia. 427, 104 N. W. 506; *Long Island Water Supply Co. v. Brooklyn, supra; State ex rel. Oregon R. & N. Co. v. Fairchild, supra.*

It is the further contention of appellants that the condemnation act, in order to meet the requirements of due process, must itself provide for notice and hearing on the question of the legality of the proceeding and that the owner cannot be forced to resort to collateral attack to secure his constitutional rights.

A discussion of this subject necessitates an understanding of the nature of the power of eminent domain. It is an attribute of sovereignty, inherent in a sovereign state whether or not reference is made to it in the Constitution of the state. In other words, the power of a sovereign state to take property, or to authorize its taking for a public use, rests upon necessity because there can be no effective government without it. The power exists independent of the Constitution, the provision of the Constitution with reference thereto being a limitation on the exercise of the power, and in no sense of the word a grant of power. In former times the right of a sovereign state to take for a public purpose was absolute, and property could be taken without compensation being paid and without requiring the intervention of a court to afford effective use of the power. The exercise of the power of eminent domain has been limited in this state by a constitutional requirement that just compensation shall be paid for all property taken or damaged. Const., art. I, sec. 21. Consequently, compensation for property taken or damaged in the exercise of the right of eminent domain, unless the amount is agreed upon must be determined in accordance with the due process clauses of the state and federal Constitutions, but otherwise judicial

action is not necessary except where required by constitutional or statutory provisions. The language of the Constitution presupposes the existence of the power outside the Constitution and simply limits the right to use it. No procedure is prescribed in the Constitution for its exercise, but it imposes certain limits to which the state itself must conform. Within these limits the state, acting through the department or agency authorized to exert the legislative power, may proceed at will, and the extent, method and necessity of exercising the power to take private property for public use may not be interfered with by either of the other departments of government. *Garrison v. City of New York*, 88 U. S. 196. There is, consequently, no limitation upon the exercise of the power except that the use must be public, compensation must be made and due process of law observed. We have heretofore determined that due process was afforded by the statute for the determination of adequate and just compensation. What application does the due process clause have to the exercise of the sovereign power of eminent domain? The correct answer was given, we think, in *People v. Adirondack Ry. Co.*, 160 N. Y. 225, 54 N. E. 689, wherein the court said: "Now, what does the phrase 'due process of law' mean, when thus applied to the exercise of a sovereign power, and to the effort of government through that power to accomplish a great public purpose? Does it have the same meaning as when applied to the action of the state in punishing a man for crime, or of one individual in seeking to enforce a civil right against another? Due process of law necessarily varies with the facts of the case and depends upon the necessity for safeguards against the exercise of arbitrary power. It consists in the observance of those safeguards which time and experience have shown are necessary to protect the citizen in the enjoyment of life, liberty and property. In public prosecutions, as well as private controversies, an opportunity to be heard is essential to protect private rights; but here we have a case where the state has the right to take a man's property against his will, although he has been guilty of no wrong.

It is a case where of necessity, if there is any action at all, it must be arbitrary. The state needs the property and takes it, and while the citizen cannot resist, he has the right to insist upon just compensation to be ascertained by an impartial tribunal. It is a compulsory purchase by public authority, and the individual receives money in the place of the property taken. He has a right to his day in court on the question of compensation, but he has no right to a day in court on the question of appropriation by the state unless some statute requires it. (*Matter of Village of Middletown,* 82 N. Y. 196, 201.) There is no necessity for any safeguard against taking, because the right to take is all there is of the power of eminent domain, and is necessarily conceded to exist when the existence of the power is admitted. Safeguards become necessary only when the question of compensation is reached, and then the courts are careful to see that the owner receives all that he is entitled to. Until then the courts could not help him, unless some statutory right were invaded, as the method of taking is within the exclusive control of the legislature. If a statute requires judgment of condemnation, judgment must be had accordingly before the property can be taken, but otherwise a certificate of condemnation by an executive officer, followed by payment, satisfies every requirement of the Constitution. If the use is not public, the statute authorizing condemnation is void, but this question of law need not be settled in the proceeding to take, as it can be raised by the property owner in a variety of ways. It would be the same in effect as if the attempt to condemn had been made without any statute whatever, and an action of trespass against those who undertook to take possession of the property would settle the question. (*Wheelock v. Young,* 4 Wend, 648.)" The Supreme Court of the United States, in affirming the foregoing case, said: "The general rule is that the necessity or expediency of appropriating particular property for public use is not a matter of judicial cognizance but one for the determination of the legislative branch of the government, and this must obviously be so where the

State takes for its own purposes. The State possesses the power as a sovereign and as a sovereign exerts it. How can its citizens call on the courts to review the grounds on which the State has acted in the absence of legislation permitting that to be done?" *Adirondack Ry. Co. v. New York State,* 176 U. S. 335, 20 S. Ct. 460.

In *Vinegar Bend Lumber Co. v. Oak Grove & Georgetown R. Co.,* 89 Miss. 84, 105, 43 So. 292, a situation on both the facts and the issues presented were very similar to the case at bar. The court said: "On a review of the whole chapter on the subject of eminent domain, we unhesitatingly arrive at the conclusion that the legislature never intended to create a tribunal of full jurisdiction to try any and all issues that might be raised on the subject of the right to condemn. The court created by this chapter is a special court, created for a special purpose, having an exceedingly limited jurisdiction, exercising no judicial functions, and clothed with the power to try the only issue that is confided to it by the statute; and that issue is, singly and solely, to fix the compensation which shall be paid to the landowner for his land. In truth, sec. 1680 declares that it is a special court. The chapter itself presupposes that the right to condemn property exists, and there is no provision made in the whole chapter on this subject giving to the eminent domain court the power to adjudicate the issue as to whether or not the right to exercise the power of eminent domain does or does not exist. The sole and only power conferred by this chapter, from its first section to its last, is the right, and the right only, to ascertain and fix compensation for the taking of the land where the right to do so exists. * * * Since neither the constitution nor the statutes provide a particular tribunal in which to try the question of whether or not the use for which private property is to be taken is a public or private use, and since it is made a judicial question by the constitution, when it is sought to try the question it must be by injunction, and in the chancery court, enjoining the entry upon or appropriation of the land, because the use for which land is sought to be tak-

en is not a public use. If it be argued that this remedy is complex, we answer by saying that its simplification rests with the legislature of the state, and not with the courts; but the constitution is not violated when there is a tribunal in which to try the question of the use to which the property is to be put. In no other forum, except the chancery court and by the method pointed out, is there any adequate remedy under the laws of this state, or, in fact, any remedy at all." In *Louisville & Nashville R. Co. v. Western Union Telegraph Co.*, 250 U. S. 363, 39 S. Ct. 513, the supreme court of the United States cites the foregoing case with approval as follows: "The Mississippi proceedings in eminent domain are limited in their effect to determining the amount of damages to be paid. If the right to condemn is disputed that is left to be decided by a suit in equity." The opinion goes on to say: "So far as it alleged a failure to comply with the state laws the state decision is conclusive against it, and of course it cannot complain of not being given a hearing simply because it is referred for that hearing to a different suit from that in which the value of the property is fixed. The separation is familiar." The effect of this holding is that an act providing for the assessment of damages and leaving the determination of the right of condemnation to a separate proceeding is not inconsistent with due process.

In *Riley v. Charleston Union Station Co.*, 71 S. C. 457, 482, 51 S. E. 485, the court in passing on a similar question said: "The first, second, fourth and fifth exceptions make the point that the act under which the defendant seeks to condemn plaintiff's property is unconstitutional in that no tribunal is provided for the determination of any question that may be made by the land owner as to the right and power of the defendant company to take plaintiffs' property. This contention cannot be sustained. While it is true, the condemnation statutes provide no special tribunal, except for the determination of the amount of compensation to be paid, nevertheless the regular machinery of the Courts is available for the determination of any issue with respect

to the right and power to condemn. *Riley v. Union Station Co.*, 67 S. C. 93, 45 S. E. 149. The remedy provided by the condemnation statute is exclusive only as to matters falling within its provisions. These statutes, in conjunction with the general law, provide for full hearing before a lawful tribunal after due notice, and thus answer every requirement of the Federal and State Constitutions, with reference to due process of law."

Summarizing the reasoning of the foregoing authorities, we come to the following conclusion: The power of eminent domain is a sovereign power inherent in the state irrespective of constitutional provisions, which in former times was absolute; that the provisions of our Constitution have the effect only of limiting the exercise of the power; that the provisions of the Constitution requiring the payment of a just compensation for property taken or damaged must comply with the requirements of the due process clause; that the power of the state to take or to delegate its power to take has not been limited by the Constitution and consequently the legislature can lawfully provide the method of taking without the aid of the other departments of government; that a contest of the right to take may properly be left to other appropriate legal action in the same manner as if the condemner proceeded without any statutory authorization; and that a statute providing due process on the matter of just compensation and which is silent on the question of affording a hearing on the right to take meets all the requirements of due process under the state and federal Constitutions. The sovereign nature of the power of eminent domain is such that the function of the courts is limited to a determination of whether constitutional provisions have been violated, and if they have not, the right of the legislature to exercise it in any manner it sees fit must be sustained. If the property be taken irregularly, or if the taking is not for a public purpose, the owner can proceed against the taker the same as any other trespasser by injunction, ejectment or any other available remedy. We are of the opinion, therefore, that the failure to provide in the

act for notice and hearing on the question of the right to take is not incompatible with due process. See *Chicago, B. & Q. R. Co. v. State ex rel. City of Omaha*, 47 Neb. 549, 66 N. W. 624. In fact, it appears that any such requirement, unless provided for in the act itself, would constitute an unwarranted limitation on the sovereign right of the state, acting through the legislative branch thereof, to take private property for a public purpose. 1 Nichols, Eminent Domain (2d ed.) sec. 17, p. 58.

We have examined plaintiffs' contention that the statutes violate the seventh and 22d interdictions of section 18, art. III, Nebraska Constitution, as class or special legislation. As to the seventh interdiction we reaffirm the rule stated in *City of Mitchell v. Western Public Service Co., supra,* that, "The act is not a special act regulating the practice of courts of justice prohibited by the seventh interdiction of section 18, art. III of the Constitution." As to the 22d interdiction the rule is that it prohibits class legislation which does not operate equally and uniformly upon all members of the class brought within its operation. In this connection the court has held that, "The legislature may make a reasonable classification of persons, corporations and property for purposes of legislation concerning them, but the classification must rest upon real differences in situation and circumstances surrounding the members of the class, relative to the subject of the legislation, which render appropriate its enactment; and to be valid the law must operate uniformly and alike upon every member of the class so designated." *State ex rel. Taylor v. Hall,* 129 Neb. 669, 262 N. W. 835. See, also, *Steinacher v. Swanson,* 131 Neb. 439, 268 N. W. 317; *Cox v. State,* 134 Neb. 751, 279 N. W. 482; *Department of Banking v. Foe,* 136 Neb. 422, 286 N. W. 264; *Eckerson v. City of Des Moines,* 137 Ia. 452, 115 N. W. 177; 29 C. J. S., sec. 212, p. 1132. We find that the classification designated in chapter 19, art. 7, R. S. 1943, is reasonable and not inimical to section 18, art. III, Nebraska Constitution.

It is already well established that the act does not violate the doctrine of the separation of powers. Const., art. 2,

sec. 1. We need not give it further discussion. *In re Appraisement of Omaha Gas Plant, supra; City of Mitchell v. Western Public Service Co., supra; In re Application of City of Sidney, supra.*

We come to the conclusion that the act complies with all requirements of the Constitution which have been called to our attention. We think the attacks upon its validity made by the appellants are without merit.

The judgment is hereby reversed and the cause remanded with directions that a decree be entered by the trial court in conformity with this opinion.

REVERSED, WITH DIRECTIONS.