GEORGE C. NICKEL ET AL., APPELLANTS, V. THE SCHOOL BOARD OF AXTELL DISTRICT R-1, KEARNEY COUNTY, NEBRASKA, ET AL., APPELLEES, AND W. H. PORTER ET AL., APPELLANTS, V. THE SCHOOL BOARD OF AXTELL DISTRICT R-1, KEARNEY COUNTY, NEBRASKA, ET AL., APPELLEES.

61 N. W. 2d 566

Filed December 18, 1953. Nos. 33415, 33416.

814

*Dryden, Jensen & Dier,* for appellants.

*William H. Meier* and *Charles A. Chappell,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

These actions were originally instituted in the district court for Kearney County by the appellants George C. Nickel, Jeannette Nickel, W. H. Porter, and Doris F. Porter. Appellants thereby sought to enjoin certain officials, whose duty it was to do so, from assessing and levying a tax against their lands located in school district R-1 for the support thereof. This district had been established under the Reorganization of School Districts Act passed by the 1949 Legislature. See Laws of Nebraska, 1949, c. 249, p. 673. The claimed right to this relief is based on the contention that the Reorganization of School Districts Act is unconstitutional or, if not unconstitutional, that the acts of the Kearney County Reorganization Committee in establishing the district were improper and, because thereof, school district R-1 should be declared void. Additional relief prayed for will not be set forth as it becomes unimportant in view of what is hereinafter held. Since both actions raise identical issues the

two causes were, in the district court, consolidated for the purpose of trial. The trial court, after a hearing, dismissed both causes of action. The appellants filed separate motions for new trial and have separately appealed from the overruling thereof. We permitted a consolidation here for the purpose of having only one bill of exceptions, brief, and oral argument. Since the issues are the same in both cases we will write but one opinion and consolidate the two appeals for that purpose.

The record shows school district R-1, which includes the village of Axtell, was organized pursuant to and in accordance with the provisions of the Reorganization of School Districts Act, which we will hereinafter refer to as the Act. This Act is set out in R. R S. 1943 as sections 79-426.01 to 79-426.19, inclusive. We will, when referring thereto, do so by section numbers of the original Act. We will not set out the Act in full nor recite all the evidence in detail but will do so only to the extent it is deemed necessary in order to properly discuss the issues raised.

Appellees raise a question as to whether or not injunction is available to appellants in this type of action. This contention is made on the ground that quo warranto provides an adequate remedy at law.

In Osborn v. Village of Oakland, 49 Neb. 340, 68 N. W. 506, we said: "It is a general rule, supported by the decisions of this and other states, that equity will not grant a party relief by injunction, where he has a plain and adequate remedy at law. It is likewise a well established doctrine in this country that quo warranto is the proper remedy to inquire whether a municipal corporation was legally created, as well as to oust persons exercising the privileges and powers of corporate officers when the municipal corporation has no legal existence."

However, in State v. Scott, 70 Neb. 681, 97 N. W. 1021, we said: "The original writ of quo warranto, which has been largely superseded by informations in

the nature of quo warranto, was a high prerogative writ and, like all other extraordinary processes, it generally would only lie when no other adequate remedy would afford the required relief. The rule appears to even go further with reference to quo warranto than with reference to extraordinary proceedings by injunction or mandamus. In the latter, it being the rule that they may be invoked where there is no adequate remedy at law, but in quo warranto it is held that it will not lie where there is even an adequate remedy by bill in equity."

In Schafersman v. School District, 120 Neb. 673, 234 N. W. 791, we held injunction to be a proper remedy to prevent a school district and its officers from assuming jurisdiction over, and taxing land in, another school district under an unconstitutional statute.

We said in State ex rel. Johnson v. Consumers Public Power Dist., 143 Neb. 753, 10 N. W. 2d 784, 152 A. L. R. 480: "* * * quo warranto is employed only to test the actual right to an office or franchise, and it can afford no relief for official misconduct or be used to test the legality of the official action of public or corporate officers. See High, Extraordinary Remedies (3d ed.) 573, sec. 618; State v. Conklin, 127 Neb. 417, 255 N. W. 925; State v. Drainage District, *supra* (100 Neb. 625, 160 N. W. 997); State v. Scott, *supra* (70 Neb. 685, 100 N. W. 812)."

We think the latter has application to the relief here sought and that quo warranto could not afford to appellants all the relief they here seek.

Appellants contend the Act is unconstitutional because it permits complete freedom of choice by a county committee in the selection of the boundaries of any proposed district and thus permits it, by gerrymandering, to discriminate between persons and property.

Black's Law Dictionary (4th ed.), p. 816, defines gerrymander as: "A name given to the process of dividing a state or other territory into the authorized

civil or political divisions, but with such a geographical arrangement as to accomplish a sinister or unlawful purpose, as, for instance, to secure a majority for a given political party in districts where the result would be otherwise if they were divided according to obvious natural lines, or to arrange school districts so that children of certain religions or nationalities shall be brought within the district and those of a different religion or nationality in another district."

We said in Elliott v. Wille, on rehearing, 112 Neb. 86, 200 N. W. 347: "* * * in determining whether any particular legislation which authorizes the creation of such a district is valid, it is proper to examine and ascertain what may be done or accomplished under and pursuant to such statutory provisions."

In Elliott v. Wille, *supra,* wherein the statute involved granted such unrestricted power to private individuals, we held, after discussion of the possibility of gerrymandering, that: "The fixing of boundaries of a political subdivision of a state into counties or districts for public purposes is a legislative function. The legislature may authorize the organization of districts for public purposes by other governmental bodies, and the proceeding may be proposed or initiated by private individuals. Where the latter course is pursued, there must be some provision for determining whether the particular district is for the public health, convenience or welfare, and a means by which an aggrieved property owner, whose property is injuriously affected, may have his rights judicially determined. The legislature may not delegate to private individuals either legislative or judicial functions. Where a legislative act permits the organization of districts, for the construction of a public improvement, by private individuals, to be paid for by a tax on all the property in the district, and no provision is made for a hearing by any tribunal as to the right of property owners who may be injuriously affected or wrongfully included within the district, it may result

in the taking of private property for a public purpose without just compensation, and in the taking of private property without due process of law." See, also, Rowe v. Ray, 120 Neb. 118, 231 N. W. 689, 70 A. L. R. 1056; Ruwe v. School District, 120 Neb. 668, 234 N. W. 789.

But here the fixing of boundaries of a political subdivision of the state for a public purpose is not delegated to private individuals but to a county committee, a public body created by section 5 of the Act.

Article VII, section 6, of the Constitution of the State of Nebraska provides: "The legislature shall provide for the free instruction in the common schools of this state of all persons between the ages of five and twenty-one years."

Article II, section 1, of the Constitution of the State of Nebraska provides: "The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted."

"It is a rule of general recognition that the formation of municipal corporations, such as counties, cities, villages, school districts, or other subdivisions, and the fixing of the boundaries of such municipal corporations are legislative functions. Among the decisions of this court which recognize this rule are: City of Wahoo v. Dickinson, 23 Neb. 426; State v. Dimond, 44 Neb. 154; City of Hastings v. Hansen, 44 Neb. 704; Bisenius v. City of Randolph, 82 Neb. 520; Winkler v. City of Hastings, 85 Neb. 212; Elliott v. Wille, on rehearing, 112 Neb. 86." Rowe v. Ray, *supra*.

In Seward County Rural Fire Protection Dist. v. County of Seward, 156 Neb. 516, 56 N. W. 2d 700, we approved the following in this regard, from Hunter v. City of Pittsburgh, 207 U. S. 161, 28 S. Ct. 40, 52 L. Ed. 151: " 'Municipal corporations are political subdivisions

of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them. * * * The number, nature and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the State. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the State within the meaning of the Federal Constitution. The State, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants and property owners may by such changes suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right by contract or otherwise in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the State and those who legislate for the State are alone responsible for any unjust or oppressive exercise of it.' "

However, we have held that this power can be delegated to the governmental bodies.

" 'The legislature may delegate a part of its power over local subjects to municipal corporations, county

boards and other public bodies within the legislative classification of departments, but not to either of the other departments.' (Searle v. Yensen, 118 Neb. 835, 226 N. W. 464, 69 A. L. R. 257.)" Nebraska Mid-State Reclamation Dist. v. Hall County, 152 Neb. 410, 41 N. W. 2d 397.

" 'The fixing of boundaries of a political subdivision of a state into counties or districts for public purposes is a legislative function. The legislature may authorize the organization of districts for public purposes by other governmental bodies, * * *.' Elliott v. Wille, 112 Neb. 78, 89." Ruwe v. School District, *supra*.

And, as stated in 11 Am. Jur., Constitutional Law, § 214, p. 924: "In those instances in which the legislature may delegate authority, it may place upon the authority so granted such restrictions and limitations as it chooses. It may also prescribe the manner and circumstances of the exercise of such power."

The county committee's duties, in this regard, are fixed by section 8 of the Act as follows: "Each county committee shall receive and consider all plans and procedures submitted to it by the state committee. The county committee shall determine, after thorough study and deliberation, whether or not any change, realignment, or readjustment of school districts or boundaries thereof within the county should be attempted."

The plans and procedures therein referred to as submitted to it by the state committee are provided for by section 7 of the Act. It provides, in this respect, as follows: "It shall be the duty of the state committee to initiate, set up, and recommend to the county committee plans and procedures for the reorganization of school districts within the various counties, and to furnish advice and assistance in connection therewith."

In exercising this authority section 9 of the Act provides: "When the county committee at any time determines that some reorganization of districts is desirable, it shall proceed to prepare a plan or plans, show-

ing which specific changes are recommended. In preparation of a plan for reorganization of school districts, the county committee shall give due consideration (1) to the educational needs of local communities, (2) to economies in transportation and administration costs, (3) to the future use of existing satisfactory school buildings, sites, and play fields, (4) to the convenience and welfare of pupils, (5) to a reduction in disparities in per-pupil valuation among school districts, (6) to the equalization of the educational opportunity of pupils, and (7) to any other matters which, in its judgment, are of importance. The county committee, in preparation of a plan for reorganization, shall take account of any advice or suggestions offered by the state committee."

In this regard section 1 of the Act provides: "* * * The term 'reorganization of school districts' means the formation of new school districts, the alteration of boundaries of established school districts, and the dissolution or disorganization of established school districts through or by means of any one or combination of the methods set out in section 2 of this act;" and "the term 'plan of reorganization' means a concrete proposal for readjustment and realignment of the boundaries of any or all school districts within a county."

The methods provided by section 2 of the Act are as follows: "Reorganization of school districts may be had and accomplished through or by means of any one or more of the following methods: (1) the creation of new districts; (2) the uniting of one or more established districts; (3) the subdivision of one or more established districts; (4) the transfer and attachment to any established district of a part of the territory of one or more districts; and (5) the dissolution or disorganization of any established district for any of the reasons specified by law."

We find the Legislature had authority to delegate to the county committee the authority given it and that the Act provides reasonable limitations and standards

for its proper guidance in carrying them out.

Appellants further contend the Act is unconstitutional because it deprives them of their property without due process of law.

Article XIV, section 1, of the Constitution of the United States provides: "* * * nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *."

Article I, section 3, of the Constitution of the State of Nebraska provides: "No person shall be deprived of life, liberty, or property, without due process of law."

We said in Ruwe v. School District, *supra*: "Due process of law requires notice and an opportunity to be heard, where financial burdens are necessarily imposed on property owners by an exercise of judicial power pursuant to specific terms of a statute."

Section 9 of the Act provides: "When the county committee at any time determines that some reorganization of districts is desirable, it shall proceed to prepare a plan or plans, showing which specific changes are recommended."

In this respect section 10 of the Act provides: "Befor any plan of reorganization is completed by the county committee, it shall hold one or more public hearings. At such hearings, it shall hear any and all persons interested with respect to (1) the merits of proposed reorganization plans, (2) the value and amount of all school property of whatever nature involved in the proposed action, (3) the amount of outstanding indebtedness of each district and proposed disposition thereof, and (4) the equitable adjustment of all property, debts, and liabilities among the districts involved. The county committee shall keep a record of all hearings in the formulation of plans for the reorganization of school districts. Notice of such public hearings of the county committee shall be given by publication in a legal newspaper of general circulation in the county at least ten days prior to such hearing."

A notice was given as provided for by section 10 of the Act. Pursuant thereto a hearing was held on January 15, 1952.

Section 11 of the Act provides: "After public hearing or hearings have been held, the county committee may formulate and complete a plan or plans of reorganization of any or all school districts within the county. Such plan shall contain: (1) A description of the proposed boundaries of the reorganized districts; (2) a summary of the reasons for each proposed change, realignment, or adjustment of the boundaries; (3) a summary of the terms on which reorganization is to be made between the reorganized districts; (4) a statement of the findings with respect to the location of schools, the utilization of existing buildings, the construction of new buildings, and the transportation requirements under the proposed plan of reorganization; (5) a map showing the boundaries of established school districts and the boundaries proposed under any plan or plans of reorganization; and (6) such other matters as the county committee shall determine proper to be included."

Such a plan was prepared. It was dated January 29, 1952. On January 30, 1952, it was forwarded to the state committee. This was done in accordance with the requirements of and for the purpose set forth in section 12 of the Act. As of March 3, 1952, the state committee advised it had approved the plan. The county committee, as required by section 13 of the Act, then submitted the proposed plan at a special election. This special election was held on May 6, 1952, in accordance with the provisions of section 15 of the Act.

Section 15 of the Act provides as follows: "Not less than sixty nor more than one hundred twenty days after receipt by the county committee of the action of the state committee, the proposition of adoption or rejection of the proposed plan of reorganization shall be submitted at a special election to all the electors of districts within the county whose boundaries are in any

manner changed by the plan of reorganization. Notice of such election shall be given by the county superintendent of schools and shall be published in a legal newspaper of general circulation in the county at least ten days prior to said election. The election notice shall (1) state that the election has been called for the purpose of affording the electors an opportunity to approve or reject the plan of reorganization, (2) contain a description of the boundaries of the proposed district, and (3) a statement of the terms of adjustment of property, debts, and liabilities applicable thereto. Such election shall be held and conducted by election officers charged with the duties of holding general elections. In such elections, all the rural territory in the proposed changes shall vote as a unit. If any existing high school district is included in the proposed district, it shall constitute a separate voting unit. Approval of the plan shall require a majority of all electors within each voting unit voting on the proposed plan."

At this election the rural territory, voting as a unit as in this section provided, voted in favor of the proposed new district by a vote of 190 to 45 and school district No. 57 of the village of Axtell, a high school district, voted 183 to 4 for the proposed district.

It becomes evident that under this Act a county committee may only formulate and complete a plan or plans for reorganization of any or all school districts within the county and cannot, by itself, change, realign, or readjust any existing school districts or the boundaries thereof. That power is left with the electorate of the area involved in any proposed plan. They may either approve or reject it.

Questions of public policy, convenience, and welfare, as related to the creation of municipal corporations, such as counties, cities, villages, school districts, or other subdivisions, or any change in the boundaries thereof, are, in the first instance, of purely legislative cognizance and, when delegated to any public body having legis-

lative power, any action in regard thereto does not come within the due process clause of either the state or federal Constitutions. See, Searle v. Yensen, 118 Neb. 835, 226 N. W. 464, 69 A. L. R. 257; Ruwe v. School District, *supra;* Nebraska Mid-State Reclamation Dist. v. Hall County, *supra;* Seward County Rural Fire Protection Dist. v. County of Seward, *supra.*

But when, as a condition to their creation or change, the public body to which such authority is delegated must find certain facts to exist upon which the Legislature has said depends its authority to declare such subdivision, or any change therein, to exist then the questions presented are of a quasi-judicial character. In such cases a hearing must be had to determine if such facts exist and proper notice thereof must be provided for and given to all parties interested therein. See, Searle v. Yensen, *supra;* Ruwe v. School District, *supra.*

Under the situation here the duties of the county committee do not fall within the category to which the due process clause of either the state Constitution or the federal Constitution has application.

But let us assume for the purpose of discussion only, that a hearing and proper notice thereof to all parties interested were required. In regard to the sufficiency of the hearing and the notice thereof provided for by the Act, see State ex rel. Tanner v. Warrick, 106 Neb. 750, 184 N. W. 896. Therein we said: "The terms of the statute which provide for a hearing on the initial question of fixing the boundaries of consolidated districts by the redistricting committee furnish sufficient notice to all parties interested of the proposed boundaries of the district."

We think the requirements of the Act would be sufficient in that regard.

Appellants further contend the Act is unconstitutional because it fails to provide for an appeal from the action of the county committee formulating and completing the plan submitted to the electorate.

In this respect Article I, section 24, of the Constitution of the State of Nebraska provides: "The right to be heard in all civil cases in the court of last resort, by appeal, error, or otherwise, shall not be denied."

We said in Pollock v. School District, 54 Neb. 171, 74 N. W. 393: "The power to change the boundaries of school districts is conferred on the county superintendent by Compiled Statutes, chapter 79, subdivision 1, section 4. To authorize the exercise of such power a petition of voters of the territory affected is requisite. The power so vested in the superintendent is to a certain extent judicial in its character and subject to review. (State v. Palmer, 18 Neb. 644; State v. Clary, 25 Neb. 403.) Section 580 of the Code of Civil Procedure (now section 25-1901, R. R. S. 1943) authorizes the review by the district court, on petition in error, of judgments rendered or final orders made by a probate court, justice of the peace, or any other tribunal, board, or officer exercising judicial functions, and inferior in jurisdiction to the district court. The provision affords an adequate remedy in such cases as the present."

Section 25-1911, R. R. S. 1943, provides for appeal from the district court to the Supreme Court.

If any action taken by the county committee was appealable, a question we need not and do not decide, these statutes fully meet the requirements of the Constitution.

Appellants contend the county committee acted in an arbitrary and unreasonable or grossly unjust manner in exercising its discretion in preparing and submitting the proposed plan and that, because thereof, its action in proposing and submitting the plan should be declared void and any action depending thereon for its legality should be restrained.

"In general, a school district or other local school organization must be so formed or laid out as to afford to all the children within its boundaries an opportunity to enjoy with reasonable facility the benefits of

the school; but every reasonable presumption is to be indulged in favor of a district as created and laid out, and equal convenience to all the children is not essential, since it is impossible to prevent varying degrees of convenience or inconvenience to children living in different parts of any district." 78 C. J. S., Schools and School Districts, § 31, p. 686.

In this respect appellants complain the county committee acted in a wholly arbitrary and illegal manner in connection with its duties as set forth in subdivisions (1), (2), (4), and (6) of section 9 of the Act and in refusing to accept and act on the advice and counsel of the state committee.

Some parts of school district R-1 are somewhat closer to Minden and Kearney than Axtell. Naturally it will take somewhat longer for the children from these areas to go to and from school but the roads used by the school buses in going to and from the school at Axtell are surfaced and in good condition. Mention is made of the fact that the school facilities at Minden and Kearney are better than the facilities at Axtell but no evidence was adduced to sustain that contention. It seems most significant that of the 13 rural school districts in Kearney County that were, by this plan, consolidated with school district No. 57 of the village of Axtell to form school district R-1, all but two had been contracting with district No. 57 for the education of their children and had been doing so for 9 years or more. Of the other two one was at the time of consolidation also doing so. The length of time it had been doing so is not shown. The other, district No. 42, had also been doing so for a part of its children for 3 years. The other children of district No. 42 were provided for by contract with the district which includes Kearney, Nebraska. Under this situation it seems only logical that the county committee would do what the respective school boards of these districts had been voluntarily doing for a long period of time;

that is, providing for the education of their children in the Axtell school.

The tax load on the property of some of the several districts may increase as a result of the consolidation but that is only natural as school taxes differ in different school districts. The evidence does not show any un-. reasonable burden or hardship created by reason thereof. It is undoubtedly true that the bond issue voted by the district on February 5, 1953, may materially increase this burden but with that we are not here concerned if the district was legally established.

In view of Leeman v. Vocelka, 149 Neb. 702, 32 N. W. 2d 274, there is serious doubt if this issue is before us, as the duties of the county committee were legislative in character. But considering the factual situation in this regard, we do not find any unreasonable or arbitrary action on the part of the committee in doing what it did. We find it acted in good faith and for the best interests and welfare of the children and electors affected. By this change all the electors of the area included were given a voice in the administration of the school where their children had been and were being educated.

It is finally contended that because of certain representations made by a member of the county committee at the public hearing on January 15, 1952, that those in charge of school district R-1 should be estopped from claiming its legal existence.

We said in May v. City of Kearney, 145 Neb. 475, 17 N. W. 2d 448: "* * * while ordinarily a municipality may not be estopped by unauthorized conduct, representations, promises or pledges of the officers, it may, within the limitation of its legal powers, be estopped by its official acquiescence in, and approval of, acts originally unauthorized. 31 C. J. S., sec. 142b, p. 419."

Therein we quoted from People v. Thomas, 361 Ill. 448, 198 N. E. 363, to the effect: "The doctrine of estoppel may be invoked against a municipal corporation where there have been positive acts by the municipal officers

which may have induced the action of a party and where it would be inequitable to permit the corporation to stultify itself by retracting what its officers had done, * * * ."

"The doctrine of estoppel in pais has application to municipal corporations, and city councils or public authorities will be estopped or not as justice and right may require." State ex rel. Cox v. McIlravy, 105 Neb. 651, 181 N. W. 554.

As said in City of Grand Island v. Willis, 142 Neb. 686, 7 N. W. 2d 457, by quoting from 10 R. C. L. 688: " '* * * an equitable estoppel rests largely on the facts and circumstances of the particular case, * * *.' "

The proceedings of the public hearing held on January 15, 1952, show the following questions were asked and answers given although it does not show who asked the questions and who gave the answers:

"How about the Phelps Co. districts who want to come in? They can come in by petition signed by 55% of the legal voters, or they may continue to contract.

"Can you petition out? By the same method as above —55% of the voters."

Section 79-402, R. S. Supp., 1951, provides in part: "The county superintendent shall create a new district from other districts, or change the boundaries of any district upon petitions signed by fifty-five percent of the legal voters of each district affected."

By letter dated February 1, 1952, the state committee advised the secretary of the county committee that: "I have received the Kearney County plan which proposes the merger of thirteen school districts in and around Axtell. * * * In reading the account of the public hearing as carried in the clipping which was attached to the proposal, I note in point (b) under 'Questions Varied' the following: 'A given district may petition out of the consolidation by a petition constituted of the names of 55 per cent of the legal voters.' I am wondering if some of the people might have taken this to mean that if the

proposal is approved by the voters, what was originally an existing district might petition out of the new district by obtaining the signatures of 55 per cent of the legal electors within the boundaries of what we (was) once their district. Of course, once the plan is approved the district lines no longer exist. If any *area* wished to withdraw from the new district, it would be necessary that the petition be signed by 55 per cent of the legal voters of the *entire new district."*

No action in regard to this matter was taken by the county committee and when, as of March 3, 1952, its proposed plan was approved by the state committee it thereafter, within the time provided by the Act, submitted the proposed plan to the electorate thereof.

Appellee cites the principle announced in 19 Am. Jur., Estoppel, § 54, p. 660, that: "The positive assertion of a fact, and not the mere expression of an opinion, is necessary to constitute an estoppel. Likewise, a statement which is honestly made and which is intended or understood to be a mere estimate will not support an estoppel. A fortiori, since it is essential to every estoppel in pais that it relate to some matter of fact, the mere expression of an erroneous opinion on a matter of law raises no estoppel." See, also, Sturm v. Boker, 150 U. S. 312, 14 S. Ct. 99, 37 L. Ed. 1093; Aunt Jemima Mills Co. v. Rigney, 247 F. 407, L. R. A. 1918C 1039; Chautauque County Bank v. White, 6 N. Y. 236, 57 Am. Dec. 442.

If it can be said that the answer given was intended to relate to the then existing districts, we think this principle is controlling for it would relate solely to a matter of law. It can also be said there is no evidence in the record that the electorate, or any part thereof, relied on this statement in voting at the election held on May 6, 1952. It is only contended it is reasonable to assume they may have. Such conjecture or surmise is not sufficient, in any event, to bring into play the equitable doctrine of estoppel.

Other matters appearing in the record, but which are not material to a disposition of the questions here raised, are the following: The fact that after its formation three rural school districts in Phelps County, together with a part of a fourth, all of which are adjacent to school district R-1, joined it by petition; the fact that the 1953 Legislature amended the Act as to the basis for establishing voting units in rural districts as evidenced by Laws of Nebraska, 1953, c. 296, p. 1001; and the fact that prior to the trial of this case on March 27, 1953, a considerable number of property owners and electors living in an area that was formerly three separate rural districts but now within school district R-1, expressed, by their signatures to several petitions, a desire to be either detached therefrom or to no longer be a part thereof.

In view of what we have said we come to the conclusion that the action of the trial court in dismissing these actions should be sustained. We therefore affirm its action in doing so.

AFFIRMED.