DELBERT TALBOTT, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, APPELLANT, v. CITY OF LYONS, NEBRASKA, A MUNICIPAL CORPORATION, ET AL., APPELLEES, IOWA ELECTRIC LIGHT AND POWER COMPANY, INTERVENER-APPELLANT.

105 N. W. 2d 918

Filed November 10, 1960. No. 34830.

*Raun & Samuelson* and *Cassem, Tierney, Adams & Henatsch*, for appellants.

*John A. Young* and *Perry, Perry & Nuernberger*, for appellees.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

Charles Walton, as a resident, taxpayer, and legally qualified voter of the city of Lyons, brought this action in the district court for Burt County on behalf of himself, and all others similarly situated, against the city of Lyons, its mayor, councilmen, clerk and treasurer, and the Kirkpatrick-Pettis Company, a corporation. The purpose of the action is to permanently enjoin the defendants, and each of them, from taking any action for the purpose of carrying out the provisions of ordinance No. 272 of the city of Lyons. This ordinance was passed and approved by the city council and mayor on June 24, 1959, and then caused to be legally pub-

lished in a local newspaper. It was enacted for the purpose of issuing "negotiable bonds of the City of Lyons, Nebraska in the principal amount of fifty-four thousand six hundred seventy-five dollars ($54,675.00) in pursuance of the provisions of Chapter 19, article 7, Reissue Revised Statutes of Nebraska, 1943, as amended, for the purpose of raising funds to tender to Iowa Electric Light and Power Company the amount of the award of the condemnation court for the gas system owned by Iowa Electric Light and Power Company, prescribing the form of said bonds and providing for the levy of taxes to pay the same and the tender of $54,675.00 to Iowa Electric Light and Power Company." The ordinance discloses that the bonds have been sold to defendant Kirkpatrick-Pettis Company, an investment brokerage firm located in Omaha, Nebraska, and that the treasurer of the city was therein directed to deliver the bonds to it upon payment of the purchase price.

After the action was started, but before trial, Charles Walton withdrew therefrom and Delbert Talbott, who was then a resident and taxpayer of the city of Lyons, was, by order of court, substituted as plaintiff. Iowa Electric Light and Power Company, a corporation, owner of the gas distribution system in the city of Lyons, was, by order of court, permitted to intervene and did file a petition of intervention. Plaintiff and intervener both contend, as a basis for the injunctive relief sought, that the defendants, and each of them, are estopped from carrying out the provisions of ordinance No. 272 because of representations and promises, both oral and written, made by the mayor and city councilmen, both directly and indirectly, to the voters of the city of Lyons immediately prior to an election held on April 3, 1956, whereat the electors voted to have the city acquire the intervener's gas distribution system. These representations, it is claimed, were to the effect that only revenue bonds would be used to purchase intervener's gas distribution system if the

electorate voted favorably for the acquisition thereof.

Upon trial the court found generally for the defendants and against the plaintiff and the intervener; found that the prayer of both for a permanent injunction should be denied; dissolved a temporary restraining order it had caused to be issued; and then rendered a judgment accordingly, dismissing the plaintiff's petition and also that of the intervener. Plaintiff and intervener filed a motion for new trial and this appeal was taken from the overruling thereof. We shall herein refer to the parties as they appeared in the court below.

The principal question raised by this appeal is one of fact, that is, do the facts established estop the city from proceeding under ordinance No. 272 and should it be enjoined from doing so? However, before proceeding with that issue, there are two contentions made by defendants which require our attention. Defendants contend there is such a material variance between the allegations and proof that plaintiff and the intervener cannot sustain their position, citing our holding in Callaway v. Farmers Union Cooperative Assn., 119 Neb. 1, 226 N. W. 802, to support this contention. Therein we held: "There can be no recovery if there is a material variance between the allegations and the proof. The allegata and probata must agree." Plaintiff alleged: "Prior to the said election of April 3, 1956, the Mayor and City Councilmen of Lyons represented orally and by written literature that Revenue Bonds would be used by the City of Lyons for the purchase of said gas system if the electorate voted favorably for acquisition thereof; that many of the businessmen in the City of Lyons distributed pre-election literature, prior to April 3, 1956, which represented that revenue bonds would be used to acquire said system, which representations were acquiesced in, and ratified by, the Mayor and City Council then in office on and immediately prior to April 3, 1956." Allegations contained in the petition of intervention are to the same effect. There is no evidence to the effect that

the mayor or councilmen represented to the voters of the city that if, at the April 3, 1956, election, they voted to acquire the gas distribution system that it would be purchased by issuing revenue bonds. However, plaintiff and intervener also alleged that the mayor and councilmen represented to the voters of the city of Lyons that only the earnings from the revenue of the gas distribution system would be used to purchase it. In view of the provisions of section 25-846, R. R. S. 1943, we shall consider the evidence adduced to see if it is sufficient to grant the relief that plaintiff and intervener here seek.

Defendants further contend that intervener, under our holding in May v. City of Kearney, 145 Neb. 475, 17 N. W. 2d 448, has no right at this time to question the source of funds which the city may use to purchase its gas distribution system in the city of Lyons. Therein we held, by quoting from Central Power Co. v. Nebraska City, 112 F. 2d 471, as follows: " 'The laws of Nebraska make adequate provision for the raising of money by cities to pay for property acquired under condemnation and since the Company must receive its payment before the City can take possession, the Company may not in this proceeding question how the City is to obtain the money with which it will pay.' " But intervener owns tangible personal property located in the city of Lyons, and taxable by it for city purposes, which is not a part of its distribution system located therein. Under this factual situation we think this contention to be without merit.

We fully discussed the doctrine of equitable estoppel as it applies to municipal corporations in the exercise of governmental functions in May v. City of Kearney, *supra*. See, also, City of Kearney v. Consumers Public Power Dist., 146 Neb. 29, 18 N. W. 2d 437; Nickel v. School Board of Axtell, 157 Neb. 813, 61 N. W. 2d 566. In May v. City of Kearney, *supra*, we held: "Ordinarily the doctrine of equitable estoppel cannot be invoked

against a municipal corporation in the exercise of governmental functions but exceptions are made where right and justice so demand, particularly where the controversy is between one class of the public as against another." Therein we went on to hold, by quoting from People v. Thomas, 361 Ill. 448, 198 N. E. 363, that: " 'The doctrine of estoppel may be invoked against a municipal corporation where there have been positive acts by the municipal officers which may have induced the action of a party and where it would be inequitable to permit the corporation to stultify itself by retracting what its officers had done, * * *.' " Therein we also said: "To preserve self government public officials in charge of, or in obtaining control of, such large public financial and economic operations must be held to strict accountability for promises and pledges made to the electorate who under the law and by their votes confer these powers upon them, in order that the electorate may cast an intelligent ballot and protect their personal and property rights." However, we went on to say: " '* * * while the attempted definitions of such an estoppel are numerous, few of them can be considered satisfactory, for the reason that an equitable estoppel rests largely on the facts and circumstances of the particular case, and consequently any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances.' "

Plaintiff and intervener seem to think the factual situation here presented brings it within our holding as it relates to the facts presented in May v. City of Kearney, *supra*. Therein the voters of the city of Kearney authorized the city to acquire, by condemnation, the electric light and power plant and distribution system serving the inhabitants of that city owned by Consumers Public Power District. Prior to the vote authorizing the city to do so the mayor and councilmen advised the voters, through various means, that the only question to be decided by the election was what a

court would say was a fair price for the property sought to be acquired; that if the price set by the court seemed fair and reasonable to the mayor and city council that the proposition of issuing revenue bonds to pay for it would then be submitted to the voters; that only revenue bonds would be used to pay for the purchase price; and that general obligation bonds payable by the city from the levy and collection of taxes would not be used. After an election was held to issue revenue bonds, which the voters defeated, the city attempted to issue general obligation bonds. We enjoined it from doing so. No such factual situation is here presented.

The intervener's 25-year franchise to sell gas in the city of Lyons, allegedly a city of the second class located in Burt County, expired some time prior to April 3, 1956. About that time someone suggested to the mayor and council that the city ought to acquire the gas distribution system and operate it. To determine if that would be feasible the city, in the fall of 1955, employed the engineering firm of Fulton and Cramer to study the matter and report its findings to the city. This was done and a report was made and submitted. It set forth the estimated value of the distribution plant to be $38,000, and estimated an annual profit therefrom, under city operation, of $15,503. In view of the fact that the mayor and councilmen caused these estimates to be published and used them as a basis for saying that if the city would purchase the gas distribution system, it would, in their opinion, pay for itself, we call attention to what we said in Nickel v. School Board of Axtell, *supra*, by quoting from 19 Am. Jur., Estoppel, § 54, p. 660, that: " 'The positive assertion of a fact, and not the mere expression of an opinion, is necessary to constitute an estoppel. Likewise, a statement which is honestly made and which is intended or understood to be a mere estimate will not support an estoppel.' " See, also, Inslee v. City of Bridgeport, 153 Neb. 559, 45 N. W. 2d 590; May v. City of Kearney, *supra*.

The matter of the city acquiring the gas distribution system of the intervener was thereafter submitted to the voters of the city at a general election on April 3, 1956. See § 19-701, R. S. Supp., 1955. It carried by a vote of 241 to 235. The value of the distribution system was thereafter fixed, by proper authorities, at $54,675. The city attempted to tender this amount by issuing its general obligation bonds, pursuant to ordinance No. 272. See § 19-704, R. R. S. 1943. It did not submit the question of issuing revenue bonds for this purpose to a vote of the electorate, as section 17-905, R. R. S. 1943, authorized it to do. It is plaintiff's and intervener's contention that because of representations made by the mayor and councilmen to the voters of the city, immediately prior to the election of April 3, 1956, that the city was required to submit to the voters of the city the question of issuing revenue bonds for the payment of the price fixed for the purpose of the distribution system and was, by reason of such representations made by its mayor and councilmen, estopped from issuing general obligation bonds under section 17-905, R. R. S. 1943.

After the mayor and councilmen had discussed the question of whether or not the city should acquire and operate the gas distribution system in the city, different members of the council, as well as the mayor and other businessmen of the city, made an investigation of the experience other cities had had in connection with operating the gas distribution systems in their respective cities. Some of these cities had acquired their gas distribution systems by the issuance of revenue bonds while others had used general obligation bonds for that purpose. Among the cities visited were Hastings, Pender, Ponca, and Alma. The experience of these cities and the report of the engineers were highly favorable to a successful operation thereof and convinced the mayor and councilmen that the gas distribution system,

if acquired, could be operated profitably and would pay for itself.

A public meeting was called and held in the city about March 15, 1956, to discuss the issue. At this meeting representatives of both sides, that is the mayor and city council as against the intervener, were present and explained to those present their views on the issue. A member of the firm of Fulton and Cramer was present. He first explained the report his firm had submitted to the city and thereafter answered any questions asked. Quite opposite views were expressed by representatives of the two sides, especially as to the earnings that could be expected. It was explained to those present that if the city were authorized to acquire the distribution system by a vote of the people that it could then issue general obligation bonds to pay for its purchase but that revenue bonds could also be used for that purpose but not unless another election was held and the voters favored doing so.

From the exhibits introduced it becomes apparent that the voters of the city were divided on the question of purchasing the gas distribution system. Forty-four businessmen, which included all the councilmen and mayor, published a full page ad in the local paper setting forth the factual situation as they found it to exist in other cities that had purchased their gas distribution system, setting forth the contents of the engineers' report, setting forth other factual data about the city of Lyons and its successful operation of other utilities, and setting forth a comparative gas rate schedule for comparable cities in size as to whether they owned or did not own their gas distribution system. It also contained a discussion of these facts. There is no evidence to show that these facts were not fairly and truthfully presented. The intervener put a full page ad in the local paper on March 29, 1956, explaining why it felt the city should not take over the distribution system and 68 individuals had their names on a handbill

put out for the same purpose. There was also a hand-bill put out by the mayor and councilmen the night before the election. We find nothing wrong with what was stated therein. It was an answer to contentions made by those opposed to the acquisition of the gas distribution system in what developed into a hotly contested election.

There is no evidence to the effect that the mayor or any member of the city council ever told anyone that only revenue bonds would be used by the city to purchase the distribution system. It is true they told everyone they believed that if the city purchased it that it would not cost the taxpayers a penny for it could be paid for out of profits arising from the operation thereof within a short number of years. There is ample evidence in the record to support such a view. It is true that some of the witnesses testified that they supposed, in view of what they were told that it wouldn't cost the city a penny, that only revenue bonds would be issued to pay for it. However, such a supposition is not sufficient to create an estoppel. The fact is that none of them said they relied thereon in casting their vote. It is apparent they did not. As we said in Nickel v. School Board of Axtell, *supra*: "It can also be said there is no evidence in the record that the electorate, or any part thereof, relied on this statement in voting at the election held on May 6, 1952. It is only contended it is reasonable to assume they may have. Such conjecture or surmise is not sufficient, in any event, to bring into play the equitable doctrine of estoppel." And in Inslee v. City of Bridgeport, *supra,* we said by quoting from 1 Dillon on Municipal Corporations (5th Ed.), § 213, p. 430: " 'Inducements in the way of statements and representations made to influence a voter, although false and fraudulent, will not invalidate the election if it does not appear that by force and fraud the voter was compelled to vote in a way he did not desire to vote.' "

It is true that in May v. City of Kearney, *supra,* we

said: "That the electorate taxpayers relied upon the promises and pledges made by the mayor and city council in the case at bar may be and is inferred from the circumstances appearing in the evidence and need not be proved by direct evidence." However, that holding has no application to the facts herein presented.

We have considered the record before us and from all the evidence adduced have come to the conclusion that the voters on both sides were fully informed as to the question being presented to them at the election held on April 3, 1956, and that neither side was misled by what was said or done. It is true that the vote was close but such is our system of government where the majority controls.

It is plaintiff's and intervener's thought that sections 19-1302 and 19-1303, R. R. S. 1943, have application to the "sinking fund" provision of ordinance No. 272 and, by reason thereof, such fund is neither authorized by the statute nor has it been by a vote of the electorate of the city of Lyons.

Section 5 of the ordinance provides as follows: "The Mayor and Council shall cause to be levied and collected annually a tax by valuation on all the taxable property within the City sufficient in rate and amount to pay the interest on the said bonds as the interest becomes due and to create a sinking fund to pay the principal of said bonds when such principal becomes due."

These sections of the statute have no application to a situation, such as here, where the electorate voted, on April 3, 1956, to acquire the gas distribution system of intervener, which vote authorized the city to issue general obligation bonds for the purchase thereof. When such bonds are issued the city has authority to cause to be levied and assessed upon the assessed value of all the taxable property within the corporate limits of the city, except intangible property, such sums as may be authorized by law for the payment of outstanding bonds. See §§ 17-507 and 17-702, R. R. S. 1943.

"A sinking fund is defined to be a fund arising from particular taxes, imposts, or duties, which is appropriated toward the payment of the interest due on a public loan and for the payment of the principal." Union P. R. R. Co. v. Buffalo County, 9 Neb. 449, 4 N. W. 53. See, also, 15 McQuillin, Municipal Corporations (3d Ed.), § 43.133, p. 697. That a sinking fund for the payment of bonds was anticipated by the Legislature is evidenced by section 77-2341, R. R. S. 1943. We think the following is applicable to the situation here presented: "A municipal corporation may, and, when so required by constitution, statute, or charter, must, prior to the issuance of bonds, make provision for the payment of such bonds and interest thereon, a common requirement being that the municipality shall, at or before the issuance of the bonds, make provision for the collection of an annual tax sufficient to pay the interest on the bonds, and to create a sinking fund for the payment of the principal." 64 C. J. S., Municipal Corporations, § 1918, p. 512.

In view of what we have said and held herein, we find the action of the trial court dismissing both plaintiff's and intervener's petitions to be correct and affirm its judgment doing so.

AFFIRMED.

SIMMONS, C. J., participating on briefs.