INNER HARBOUR HOSPITALS, LTD.,
A GEORGIA NONPROFIT CORPORATION, ON BEHALF OF
BRENDA HIBBERD, APPELLANT, V. STATE OF NEBRASKA
DEPARTMENT OF SOCIAL SERVICES, APPELLEE.

559 N.W.2d 487

Filed February 21, 1997.    No. S-95-294.

Richard P. Nelson and Abbie J. Widger, of Nelson Morris & Titus, and R. Scott Stevenson, of Harry Trauffer & Associates, for appellant.

Don Stenberg, Attorney General, and Royce N. Harper for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, and GERRARD, JJ., and QUIST, D.J.

CAPORALE, J.

## I. STATEMENT OF CASE

The defendant-appellee, Nebraska Department of Social Services, denied the claim of the plaintiff-appellant, Inner Harbour Hospitals, Ltd., for payment under the terms of the "Medical Assistance Provider Agreement" entered into by Inner Harbour and the department for care Inner Harbour provided Brenda Hibberd, a minor adopted by Patrick and Barbara Hibberd under a "Subsidized Adoption Agreement" with the department. Inner Harbour appealed to the district court pursuant to the Administrative Procedure Act, Neb. Rev. Stat. § 84-901 et seq. (Reissue 1994). The district court affirmed the department's decision, but remanded the matter in order that the department might determine whether it had an obligation under the adoption agreement to pay Inner Harbour for the care it provided the minor. In its appeal to the Nebraska Court of Appeals, Inner Harbour asserted, in summary, that the district court erred in (1) determining the type of care Inner Harbour provided the

minor, (2) determining the type of care qualifying for medicaid payments, and (3) failing to rule that the department was estopped from denying liability for medicaid reimbursement. Under our authority to regulate the caseloads of the two courts, we, on our own motion, removed the matter to this court. We now affirm as modified.

## II. SCOPES OF REVIEW

On an appeal under the Administrative Procedure Act, an appellate court reviews the judgment of the district court for errors appearing on the record and will not substitute its factual findings for those of the district court where competent evidence supports those findings. *Rainbolt v. State*, 250 Neb. 567, 550 N.W.2d 341 (1996). However, to the extent the interpretation of statutes and regulations is involved, questions of law are presented, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below, according deference to an agency's interpretation of its own regulations, unless plainly erroneous or inconsistent. See *Slack Nsg. Home v. Department of Soc. Servs.*, 247 Neb. 452, 528 N.W.2d 285 (1995).

## III. FACTS

Although the pertinent copy of the provider agreement in the record is not as readable as it should be, we can discern that in addition to agreeing to participate as a medical assistance program hospital provider, Inner Harbour undertook to follow the department's policies and procedures in the administration of the program and to accept the payments made under the program as full and complete payment for the services rendered.

Inner Harbour provides care in both a locked unit and an unlocked "wilderness setting" unit. Its locked unit is similar to an acute care hospital. Its unlocked unit consists of cabins in a wilderness setting which house two to three patients each. Inner Harbour does not place supervisors in every cabin, but does have supervisors on the "campsite" 24 hours a day. Thus, the patients in the unlocked unit have access to 24-hour medical treatment. Although the cabins in the unlocked unit are less restrictive than the locked facilities, the frequency, intensity, and type of treatment are the same in both.

Inner Harbour admits its children patients into the locked unit in 99.6 percent of its cases, and when the children reach a "level of stability," they are transferred into the unlocked unit. Before a patient is transferred permanently to the unlocked unit, the patient goes through a transition phase wherein the patient is allowed to spend the day in the wilderness setting and the evenings in the locked unit.

The Sunderbruch Corporation-Nebraska is the physician peer review organization authorized under the terms of a contract with the department for services financed through the program to conduct on behalf of the department reviews of inpatient hospital services and to perform inpatient utilization reviews. Pursuant to program regulations, Sunderbruch performs preadmission reviews and regular "continued stay" reviews to determine if inpatient stay is required. A continued stay review is performed after admission during a patient's hospitalization to determine the medical necessity and appropriateness of continuing the patient's stay in a hospital level of care. According to Bonnie Brown, a department employee, when nonstate wards, such as the minor, go to inpatient hospitalization, Sunderbruch handles the preauthorization and continued stay reviews; in contrast, the department conducts continued stay reviews for state wards.

On March 24, 1992, pursuant to a telephone review, Sunderbruch approved the minor's admission into an acute care program. Inner Harbour admitted the minor on March 25 and placed her in the locked unit. Sunderbruch's records indicate that on February 9, 1993, the minor was transferred to "residential care" and that the "acute psychiatric review was terminated." On May 4; Inner Harbour staff discovered that the minor was carrying a knife, and after being confronted, the minor threatened staff. As a result, the minor was readmitted into the locked unit. Sunderbruch's records further indicate that the minor was returned to the unlocked unit on May 6. However, Dr. James Claytor, who is board certified in psychiatry, has worked with Inner Harbour since October 1988, and is one of its clinical directors and the minor's attending physician since her admittance, is of the view that the minor was transferred back to the unlocked unit on May 25, 1993.

Claytor testified that the minor was returned to the locked unit on June 3 or 4, 1993, for a brief period of time after threatening staff members. Sunderbruch's records indicate that the minor was given a "therapeutic pass with family" from June 5 to 7. Inner Harbour also put the minor in the locked unit overnight on July 10 because she was suffering a migraine headache. She was again returned to the locked unit on July 30 after attempting to run away and on August 2 for verbally and physically threatening others.

Sunderbruch denied continued coverage for the minor's treatment for the periods of February 9 to May 3, 1993, and May 7 to August 3, 1993, on the ground that the minor was no longer receiving "acute inpatient services" for those periods. According to Melvin Clothier, a department staff supervisor, "[t]he decision to deny services to [the minor] as of February 9 was reached after a thorough medical review of evaluation of the patient's individual case record for treatment and her progress." Clothier also stated:

> The information provided Sunderbruch during the review conducted on February 15 of 1993 indicated that the [minor] had been transferred to residential care on February 9 of 1993. It was therefore determined that with the exception of services furnished on I believe May 3 through May 6 of 1993, that [program] benefits should be denied beginning February 9, 1993.

According to Claytor, the minor "has had one of the most severe depressions [he has] seen in an adolescent . . . ." Staying in the locked unit for 11 months straight is "extremely unusual," and he is of the view that if Inner Harbour had released the minor on February 9 when the payments stopped, she would be at a high risk for running away, acting out aggressively, and becoming self-abusive, and she would have regressed. Claytor is of the opinion that all of the minor's treatments were medically necessary.

Dr. John Riedler, board certified in psychiatry, reviewed the minor's chart, but has not talked to anyone at Inner Harbour nor to the minor. Riedler testified that for a patient to be admitted into an acute inpatient setting, risk behaviors must exist, such as

self-destructiveness, danger to self or others with a severe level of functional daily activity dysfunction and this has to be of a medical nature so that the disorder that's being treated has to be one that's recognized as a medical condition generally speaking. And the need for the services has to be such that the physician supervision is required on a daily basis, 24 hours per day so that the structure would need to be of a severe high enough intensity that both nurses and physicians would be needed on a regular, all the time basis and the physician would need to be seeing the patient on a daily basis.

Examples of risk behaviors include cutting oneself, gouging oneself, ingesting toxic substances, and injuring oneself badly. Riedler is of the view that Inner Harbour's residential facility is not an acute inpatient setting and of the opinion that Inner Harbour has not provided acute psychiatric inpatient hospitalization for the minor.

According to Riedler, the minor does not meet the criteria for acute care. Thus, housing her at Inner Harbour, in either the locked or the unlocked unit, is not medically necessary at all. Riedler is of the view that the minor should have been treated by placement in a therapeutic foster home or a therapeutic group home. According to Riedler, the minor needs "a consistent nurturing stable environment where she can develop family relationships and develop as a normal, . . . population instead of being looked at as if she's some kind of special person with all kinds of special problems which is the way she's being treated now." Riedler further is of the opinion that Inner Harbour's treatment was contributing to the minor's problems.

Jackie Childress and Joy M. Kruppa, Inner Harbour employees, testified telephonically. On February 15, 1993, a "Jan" at Sunderbruch told Kruppa that Sunderbruch would no longer be reviewing the minor's stay, since she was no longer in acute care. Kruppa took this comment to mean that the department would now handle the minor's bills as it did those of Jack Malone, a state ward and patient at Inner Harbour whose medical expenses are paid by the State under contract with Inner Harbour. According to Kruppa, Sunderbruch does not conduct continued stay reviews for Malone's treatment. Both Childress

and Kruppa testified that they did not know whether the minor was a state ward, but nonetheless believed that her claims would be handled the same way as Malone's.

Until February 1993, the department had paid for all of the minor's medical care at Inner Harbour. Around April 9, Inner Harbour became concerned, as it was no longer receiving payments for the minor's care, and on May 21 concluded that it was "getting the run around with the state." Childress testified that on July 8, Jane Steele, the department program worker who processed the minor's claims, called Inner Harbour and stated that checks for March, April, and May 1993 should be coming, and to send any future claims to Marge Vontz. Inner Harbour has not received checks for those months.

Childress testified that she spoke to Vontz on July 26, 1993, and was told to resubmit all claims to the department. Childress further testified that on September 14, someone at Inner Harbour talked to Bobbie Frerichs at Sunderbruch, who stated that she would send the checks for all claims through August by the first of October 1993. Also, on September 27, after Kruppa talked to Laura Riggs, Steele's supervisor, Kruppa told Childress that "Laura does not see any problems at this time." Childress interpreted this as meaning that as of September 27, Riggs did not see any problems with paying for the minor's treatment.

Kruppa testified that September 30, 1993, "was the first time that [she] had heard the word denial based on anything to do with medical necessity or acute care or anything like that." Kruppa stated that up until September 30, Inner Harbour believed that the department was going to pay for the minor's care. She also testified that Sunderbruch did not tell Inner Harbour that it would have to apply for residential care separately and that neither Sunderbruch nor the department sent Inner Harbour anything indicating that the department would cover residential care.

## IV. ANALYSIS

The district court found that during the period in question, the minor had been receiving residential care and that acute care was not medically necessary. It then wrote that "this does not

resolve the issue as to whether the [d]epartment is obligated to pay Inner [Harbour] based on the subsidized adoption agreement . . . ." The district court also noted that it did not decide "whether [the adoptive parents] complied with the terms of the agreement nor whether the [d]epartment complied with the [pertinent] notice provisions . . . ."

However, so far as the record reveals, the only issue presented to and considered by the department was whether Inner Harbour is entitled to payment under its provider agreement with the department. Section 84-917 provides that one "aggrieved by a final decision in a contested case" before an administrative agency "shall be entitled to judicial review . . . ." Assuming, but not deciding, that the department has jurisdiction to pass upon the rights, if any, which Inner Harbour may have against the department under the latter's agreement with the adoptive parents, the fact is that the matter was not before the department, and it therefore made no decision, final or otherwise, with respect thereto. That being so, there was no decision for the district court to review in that regard; it was therefore without jurisdiction to issue any orders with respect to the adoption agreement. See *Bohling v. State Bd. of Pub. Accountancy*, 243 Neb. 666, 501 N.W.2d 714 (1993) (holding that in absence of valid final order, district court lacked power to review board's action). Accordingly, the portion of the district court's order which purports to remand this case to the department for further proceedings under the adoption agreement must be vacated, set aside, and held for naught.

## 1. CARE PROVIDED

That having been determined, we direct our attention to the first assignment of error, in connection with which Inner Harbour asserts that the district court erred in finding that the minor was receiving custodial or residential and not acute care. However, Inner Harbour does not argue this assertion in its brief. Not only must a claimed prejudicial error be assigned, it must also be discussed in the brief of the asserting party; an appellate court will not consider assignments of error which are not discussed in the brief. *Landmark Enterprises v. M.I. Harrisburg Assocs.*, 250 Neb. 882, 554 N.W.2d 119 (1996);

*Farmers & Merchants Bank v. Grams,* 250 Neb. 191, 548 N.W.2d 764 (1996). We therefore accept without analysis the district court's finding that during the period in question, the minor received residential care.

## 2. QUALIFYING CARE

In the second assignment of error, Inner Harbour asserts the district court wrongly determined that although providing acute psychiatric care entitles the provider to reimbursement under the program, providing residential psychiatric care does not.

A care facility seeking reimbursement from the department pursuant to state medical assistance program regulations has the burden to prove its entitlement thereto. *Sunrise Country Manor v. Neb. Dept. of Soc. Servs.,* 246 Neb. 726, 523 N.W.2d 499 (1994).

Under 471 Neb. Admin. Code, ch. 20, § 001.02 (1990), inpatient hospital psychiatric services are covered under the program only if such services are medically necessary. Inner Harbour correctly notes that ch. 20, § 001.02A, does not make acute care a requirement for reimbursement and that "[t]he correct standard is active psychiatric care pursuant to 471 N.A.C. § 20-001.02.A." Brief for appellant at 14. Inner Harbour further contends that ch. 20, § 001.02, only requires that a patient receive active treatment, not acute care, and that the main distinction is between hospitals providing inpatient active care and those providing chronic or custodial care. Chapter 20, § 001.02A, defines "active treatment" as follows:

> 1. Treatment provided under a treatment plan . . . .
>
> 2. Reasonably expected to improve the client's medical condition or to determine a psychiatric diagnosis. The treatment must, at a minimum, be designed to reduce or control the client's psychiatric symptoms to facilitate the movement of the client to a less restrictive environment within a reasonable period of time.
>
> . . . .
>
> 3. Services supervised and evaluated by a psychiatrist.

In Inner Harbour's view, the minor's care met the foregoing criteria.

Inner Harbour also argues that the use of an acute care standard violates department regulations requiring that psychiatric care be provided by the least restrictive means. Chapter 20, § 001.02A(2), requires that inpatient active treatment "must, at a minimum, be designed to . . . facilitate the movement of the client to a less restrictive environment within a reasonable period of time." Also, 471 Neb. Admin. Code, ch. 10, § 010.11 (1988), requires that "[i]npatient hospital care must be reasonable, medically necessary, and appropriate for the billed class of care." Furthermore, 471 Neb. Admin. Code, ch. 20, § 001 (1988), states:

> The [d]epartment['s] philosophy is that all [inpatient hospital psychiatric] care provided to clients must be provided at the least restrictive and most appropriate level of care. . . . More restrictive levels of care will be used only when all other resources have been explored and have been deemed to be inappropriate. Inpatient hospital psychiatric services are medically necessary psychiatric services provided to an inpatient as defined in 471 NAC 10-001.02.

While Inner Harbour argues that the minor received the same level of care in both the locked and the unlocked unit, Claytor's testimony is that if a patient in the wilderness setting required immediate medical attention, the patient would be returned to the locked unit. Thus, placing the minor in the unlocked wilderness unit is sufficient proof that she no longer needed 24-hour medical attention and daily visits from her physician. Neither is there any showing that the care in question met the requirement of ch. 20, § 001.02A(3), which states that "[t]he client must be treated by a psychiatrist at least three times a week . . . ."

Moreover, although participation in the medical assistance program is voluntary, a state that chooses to participate must comply with federal statutory and regulatory requirements. *Wilder v. Virginia Hospital Assn.*, 496 U.S. 498, 110 S. Ct. 2510, 110 L. Ed. 2d 455 (1990); *Alexander v. Choate*, 469 U.S. 287, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985); *Harris v. McRae*, 448 U.S. 297, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980). Furthermore, the Supremacy Clause compels compliance with federal law and regulations by participants in the medical assistance program. *Elizabeth Blackwell Health Center for Women v.*

*Knoll*, 61 F.3d 170 (3d Cir. 1995), *cert. denied* ___ U.S. ___, 116 S. Ct. 816, 133 L. Ed. 2d 760 (1996).

Under 42 U.S.C. § 1396d(a)(16) (1994), medical assistance includes payment for "inpatient psychiatric hospital services for individuals under age 21, as defined in subsection (h) of this section." Section 1396d(h)(1)(A) states that inpatient psychiatric hospital services for individuals under age 21 includes only "inpatient services which are provided in an institution (or distinct part thereof) which is a psychiatric hospital as defined in section 1395x(f) of this title or in another inpatient setting that the Secretary [of the U.S. Department of Health and Human Services] has specified in regulations." Also, ch. 20, § 001, requires that inpatient hospital psychiatric services must be provided by a hospital that meets the requirements for participation in the program for psychiatric hospitals. Those requirements are set out in 42 U.S.C. § 1395x(f) (1994), which states that "[t]he term 'psychiatric hospital' means an institution which . . . satisfies the requirements of paragraphs (3) through (9) of subsection (e) of this section." Finally, § 1395x(e)(5) states that "[t]he term 'hospital' . . . means an institution which . . . provides 24-hour nursing service rendered or supervised by a registered professional nurse, and has a licensed practical nurse or registered professional nurse on duty at all times . . . ."

Thus, while the department's interpretation of the level of care required for reimbursement as "acute" is erroneous, as was the district court's adoption of the "acute care" standard, the regulations governing the medical assistance program nevertheless require that the psychiatric treatment be "active." See ch. 20, § 001. Although the evidence would support a finding that the care in question constituted "active treatment" as defined in ch. 20, § 001, the foregoing statutes and regulations also make clear that only inpatient psychiatric services given those under age 21 in a facility which provides 24-hour nursing service qualify for payment under the program. The evidence does not establish that the care in question was provided in such a setting. Furthermore, 471 Neb. Admin. Code, ch. 20, § 001.01B(4)(b) (1988), provides that "[t]he staffing pattern must ensure the availability of a registered professional nurse

24 hours each day . . . ." The testimony does not establish that Inner Harbour's wilderness setting care meets that requirement.

Consequently, there is no merit to the second assignment of error.

### 3. CLAIMED ESTOPPEL

In the third and final assignment of error, Inner Harbour claims that the district court erred in failing to find that the department's actions estopped it from denying reimbursement under the program.

It is true that the state or one of its political subdivisions may be subject to the doctrine of equitable estoppel under compelling circumstances where right and justice so demand in the interest of preventing a manifest injustice. *Jennings v. Dunning*, 232 Neb. 366, 440 N.W.2d 671 (1989). The doctrine of equitable estoppel applies where, as a result of conduct of a party upon which another person has in good faith relied to one's detriment, the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed. *Friehe v. Schaad*, 249 Neb. 825, 545 N.W.2d 740 (1996). The elements of equitable estoppel are, as to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. As to the other party, the elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to one's injury, detriment, or prejudice. *Hullinger v. Board of Regents*, 249 Neb. 868, 546 N.W.2d 779 (1996).

The program requirements for inpatient hospital psychiatric services are set out in federal statutes and were, or should have been, well known to Inner Harbour. Thus, the district court did

not err in determining that Inner Harbour should be "charged with the knowledge that the type of treatment" was not covered.

When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Rainbolt v. State*, 250 Neb. 567, 550 N.W.2d 341 (1996). Thus, Inner Harbour clearly fails in at least one of the elements to establish equitable estoppel, namely, the "lack of knowledge and of the means of knowledge of the truth as to the facts in question" prong.

## V. CONCLUSION

There being no merit to Inner Harbour's assignments of error, the district court's order is modified as set forth in part IV above and, as so modified, is affirmed.

AFFIRMED AS MODIFIED.