AGREX, INC., ET AL., APPELLEES, v. CITY OF SUPERIOR, A MUNICIPAL CORPORATION, APPELLANT.

581 N.W.2d 428

Filed June 23, 1998. No. A-97-275.

238

David B. Downing, of Downing, Alexander, Wood & Ilg, for appellant.

Gary J. Nedved, of Keating, O'Gara, Davis & Nedved, P.C., for appellees.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

MUES, Judge.

## INTRODUCTION

The City of Superior (City) appeals from the decision of the district court for Nuckolls County which applied the doctrine of equitable estoppel to the City and issued an injunction prohibiting it from annexing the land owned by the appellees, Agrex, Inc., et al. Based upon our de novo review, we determine that the elements of equitable estoppel were not proved by clear and convincing evidence. Therefore, we reverse and remand.

## BACKGROUND

On July 16, 1996, the City passed ordinance No. 926, which annexed six tracts of land which had previously been adjacent to the City's corporate limits. These six tracts of land were owned in fee simple by the appellees: Agrex, Inc.; Superior Implement, Inc.; Superior Deshler, Inc.; Supreme Products, Inc.; Sonya Romersheuser, doing business as State Farm Insurance; and Irene Church, doing business as Superior Transfer (collectively referred to as the "owners"). On July 23, , the owners filed a petition for injunctive relief which requested the district court to enjoin the City from annexing their property and in any way enforcing the provisions of the ordinance.

The owners alleged that their property was located in the East Park Industrial Subdivision (Park), which was created as an industrial area by the City in 1977 pursuant to Neb. Rev. Stat. § 14-403 (Reissue 1997) and an ordinance of the City, and that the City could not annex their property unless the majority of them consented in writing or the annexation was stipulated to at the time of the original designation. They alleged that the City had not complied with Neb. Rev. Stat. § 13-1115 (Reissue 1997) regarding annexation of property within an industrial area and, instead, had proceeded with the annexation on the basis that the area was not legally an industrial area because provisions of the Industrial Areas subsection of the Industrial Development Act, Neb. Rev. Stat. § 13-1111 et seq. (Reissue 1997), for creation of an industrial area had not been complied with at the time the Park was created.

The owners further alleged that they were induced to purchase property and operate their businesses within such industrial area because it was so designated as an "industrial area." The owners asked that the City be enjoined from annexing the Park due to lack of compliance with § 13-1115 or, in the alternative, that it be equitably estopped from annexing the property because the owners had detrimentally relied on the original actions of the City, had changed their positions relative to the City's actions, and had incurred financial obligations and expenses as a result. They also alleged that the exact amount of their damages was unknown and that, thus, they had no adequate remedy at law and would suffer permanent damage without the injunction.

The City answered, denying all allegations and asking the court to dismiss the petition. A final hearing was held on November 26, 1996. The parties stipulated that ordinance No. 667, dated May 23, 1977, approved the final plat of the Park, which plat shows approval of all owners of property and acceptance of the plat by the Nuckolls County Board of County Commissioners on May 3, 1977; that there was no compliance with any portion of Neb. Rev. Stat. § 19-2501 et seq. (Reissue 1977) (now codified at § 13-1111 et seq.), which delineated the procedure to follow in creating an industrial area (file an application requesting the area be designated an "industrial area" with the county clerk, clerk notifies municipal legislative bodies, hearing is held, and then county board designates the area as an "industrial area" not subject to annexation); and that when the City passed ordinance No. 926 in 1996 it did not comply with § 13-1115 (three ways to annex a designated "industrial area") regarding annexation of property within an industrial area, instead claiming that the Park was not an industrial area because of lack of compliance in 1977 with § 19-2501 et seq. Exhibit 2, a letter dated October 23, 1995, from the Nuckolls County Attorney to the Superior Economic Development Council, was used to establish that the exceptions allowing annexation under § 13-1115 were not applicable, but that during his review of the case, the county attorney found that the procedural formalities to designate the land as an "industrial area" had not been complied with.

At trial, Keith Burt (Burt), who owns the Superior Implement building that is now operated by his daughter and son-in-law, Janet and Kim Eggers, testified that he purchased his land in the Park in 1981 and 1982 in order to get out of the City limits to avoid the tax consequence of being located in the City. He testified that prior to purchasing the land, he had a 20-minute meeting with the seller and that there were City personnel present, as well as a member of the Industrial Development Corporation of Superior, which was formed to promote and develop the City, including starting an industrial park. During this meeting, the City officials told Burt that since the land was in an industrial park "it would never be put in the city limits" and that such did not need to be put in writing because "it was in their minutes that it would not be in the city limits." Burt testified that based on these representations from City officials, he was satisfied that the property would not be annexed, so he bought it. However, he stated that he never looked at the minutes the City officials referred to and could not refer to the City personnel by name, merely calling them the mayor and city councilmen. Burt never personally appeared before the city council or sought legal advice on the actual status of this land before he purchased it. However, he testified that he "would absolutely never put it [presumably his implement-business building] up" if the property was subject to annexation.

Margie Burt, Burt's wife, testified that she was at this meeting and also remembers hearing that the City would not annex the land because it was in the Park. She repeated that they would not have bought this land if it was subject to annexation.

John Burt, Burt's son, testified that he was involved in the 1982 meeting his father referred to. He testified that the mayor, Harry Robbinson, and city councilman Bruce McCullough were there. He stated that these people were there to encourage them to buy this property because it was a drawing card for the community. He reiterated that the "city people" represented that the property was in an industrial park that would never be annexed into the City by saying that "that industrial park would never be in the city limits of Superior, never." They told him that they had created the industrial park to attract agricultural business. He did not seek to determine the legal status of the property before

he purchased it, nor did he appear before the city council to receive such assurances, but stated that he would "[a]bsolutely not" have put up the building if it was subject to annexation.

Exhibit 10 is a letter that Burt wrote in 1984 to the Superior Planning Commission. In the letter, Burt states, "When I was in the process of purchasing this business, I was assured that it would not be annexed as I understood this land was for the purpose of Industrial Development for the City of Superior." The letter also states that if the City persisted in its annexation plans, he would "have the County declare this land an Industrial Area and thus stop the annexation."

Janet Eggers, Burt's daughter, who presently runs Superior Implement with her husband, testified that the business' property taxes would increase approximately 40 percent if the property were annexed and that sales tax would go up by 1 percent. She explained that she had received many complaints from her customers about this increase in sales tax which she was required to charge beginning shortly after the City voted to annex the property and that some of her customers were now driving to Kansas to buy their parts.

Roger Myhre, senior vice president at Agrex, testified that he was involved in picking the site for location of the Agrex facility, which cost approximately $5.5 million to build. He testified that Agrex has two other Nebraska facilities which are located at least 2 miles from the nearest town due to safety, environmental, and cost reasons. He testified that an Agrex employee, who is no longer with the company, reported to him after meeting with City officials and the economic development council that the land they were thinking of purchasing was located in an industrial park. This employee told Myhre that the City officials used the industrial park as a selling point because it would not become part of the City by being annexed. Myhre stated that Agrex's taxes would go up approximately $30,000 per year if the annexation were allowed to go through and that this would have been a significant consideration in the decision to build the facility. He explained that Agrex looked at two sites in Superior and that the site not chosen would have been easier to acquire but the fact that the site they chose was in an industrial park not subject to annexation was a significant factor in deciding to

build there. However, he admitted that nobody ever represented to him personally that the site would not be annexed and that Agrex never obtained a legal opinion or appeared before the city council seeking formal assurance or a representation that this ground would never be annexed.

Sonya Romersheuser testified that she purchased her property in the Park in 1995 and that its designation as an "industrial park" played a role in her decision to purchase the property. She believed that the land was not subject to annexation because it was in an industrial area. This belief was based on years of "reading newspapers and listening to the news media regarding industrial tracts in and around other communities," but she had no legal basis for such belief. Her taxes will go up 42 percent if the annexation goes through. She also testified that her development options will be limited if her building is located within the City limits. She admitted that no City personnel had represented to her that the property was not subject to annexation.

The owners rested, and the City called William Blauvelt after its motion for directed verdict was overruled. Blauvelt testified that he is the publisher of the local newspaper Superior Express and that he served as secretary-treasurer of the Industrial Development Corporation of Superior (Corporation) for several years, including the early 1970's. He testified that the Corporation was formed for economic promotion and development of the City. He stated that the Corporation purchased the land which is now the Park and had it platted. At that time, he remembered some of the businesses located within the platted area were concerned about annexation, but eventually all of the businesses signed off on the plat. He testified that the Corporation never petitioned the county to make the industrial area immune from annexation because the Corporation was never aware that it could so create an industrial area. He also stated that he told an Agrex representative, "[W]e can't promise you that we'll never annex you. We cannot bind a future council . . . ." He admitted that he worked with an Agrex employee to help get the land and also took the plat to the county board for approval. He testified that he thought the land "was an area that was not immune to annexation." He stated that he specifically

told the Agrex employee that Agrex would be subject to annexation, but that the Corporation would discourage annexation.

Gary Kile testified that in 1984, while he was mayor, the City considered annexing the Park, but the city council decided that they should not "encourage Agrex to build and then go out and gobble them up." He stated that the city council never questioned its ability to annex this property. He testified that he was an active member of the city council when the plat was accepted in 1977 and that nobody ever represented to him that the area would be immune from annexation and stated that he did not know that there was a specific legal connotation to the words "industrial area." The City rested.

On February 28, 1997, the district court entered a permanent injunction prohibiting the City from annexing the Park and enforcing ordinance No. 926. The court specifically found that two of the owners, Agrex and Superior Implement, relied on representation by the City that this was an industrial park created pursuant to law when deciding to build in the Park. It held that by its original actions, the City intended to create the Park as an industrial tract, but that procedural deficiencies resulted in its never being legally created and that the City implicitly and explicitly represented that the property was an industrial park to at least two of the owners, which resulted in their expending large sums of money to develop their businesses in the Park; thus, the district court applied the doctrine of equitable estoppel to prohibit the annexation of the property. The court entered a permanent injunction from which the City appeals.

## ASSIGNMENT OF ERROR

The City alleges that there was insufficient evidence to support the trial court's decision to apply the doctrine of equitable estoppel to enjoin the City from annexing the Park.

## STANDARD OF REVIEW

An action for injunction sounds in equity. *Robertson v. School Dist. No. 17*, 252 Neb. 103, 560 N.W.2d 469 (1997). In an appeal of an equity action, an appellate court tries factual questions de novo on the record, reaching a conclusion independent of the findings of the trial court. However, where credible evidence is in conflict on a material issue of fact, the appel-

late court will consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Hanigan v. Trumble*, 252 Neb. 376, 562 N.W.2d 526 (1997).

## DISCUSSION

The City argues that there was insufficient evidence to prove each element of equitable estoppel by clear and convincing evidence. The elements of equitable estoppel are, as to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. As to the other party, the elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to one's injury, detriment, or prejudice. *Inner Harbour Hospitals v. State*, 251 Neb. 793, 559 N.W.2d 487 (1997); *Hullinger v. Board of Regents*, 249 Neb. 868, 546 N.W.2d 779 (1996). See, also, *Bohl v. Buffalo Cty.*, 251 Neb. 492, 557 N.W.2d 668 (1997); *Jeter v. Board of Education*, 231 Neb. 80, 435 N.W.2d 170 (1989); *Kohlbeck v. City of Omaha*, 211 Neb. 372, 318 N.W.2d 742 (1982). Each element of equitable estoppel must be proved by clear and convincing evidence. *Double K, Inc. v. Scottsdale Ins. Co.*, 245 Neb. 712, 515 N.W.2d 416 (1994). Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997).

The Nebraska Supreme Court has restricted the application of equitable estoppel against a governmental entity, stating: " ' "Ordinarily, the doctrine of equitable estoppel cannot be invoked against a municipal corporation. . . . Exceptions are

made only where right and justice so demand. The doctrine is to be applied with caution and only in exceptional cases under circumstances demanding its application to prevent manifest injustice.". . .' " *Willis v. City of Lincoln*, 232 Neb. 533, 540, 441 N.W.2d 846, 850 (1989), quoting *Christian v. Geis*, 193 Neb. 146, 225 N.W.2d 868 (1975). See, also, *Jennings v. Dunning*, 232 Neb. 366, 440 N.W.2d 671 (1989) (doctrine of equitable estoppel should not be lightly invoked against State).

Based on the foregoing, the burden of one attempting to equitably estop a governmental entity is a heavy one—as in any application of the doctrine, all six elements must be proved by clear and convincing evidence. But upon reaching that plateau, the person seeking estoppel against a governmental entity must go a step higher—the evidence must show it to be an "exceptional case" and that the circumstances demand its application to prevent "manifest injustice." A good example of the lengths to which our Supreme Court has reached to deny the application of equitable estoppel against a governmental entity is seen in *Bohl v. Buffalo Cty., supra*. There, a tort claim against a county was denied because the claimant filed suit beyond the statute of limitations. She sought to estop the county from asserting the statute of limitations defense on the basis that the insurance agent for the county's liability insurer had told her in writing that the statute of limitations was 4 years. The Nebraska Supreme Court found that the facts pled were insufficient to save her action against the county on grounds of equitable estoppel.

With these principles in mind, we turn to our de novo review of the evidence. The City argues that it did not explicitly or implicitly represent that the Park was not subject to annexation; that any statements made by the mayor or a city councilman to that effect were made in an unofficial capacity which was not authorized or acquiesced in by the City; and that even if such statements were made, the owners had the means to determine the truth, i.e., that the necessary steps to make the Park an "industrial area" not subject to annexation had not occurred. The City also alleges generally that the circumstances do not demand the application of equitable estoppel to prevent manifest injustice.

Of course, the owners argue that they have proved every element of equitable estoppel and that the City, through its mayor and council members, explicitly and implicitly represented that the Park was not subject to annexation, that they were entitled to rely on such representation and were not required to independently verify whether the Park was subject to annexation, and, thus, that the doctrine of equitable estoppel was properly applied. We disagree for several reasons.

*Representation Not City's.*

First, as the City points out, there is no evidence to show that it made a false representation or concealed facts regarding the Park's not being subject to annexation. Three witnesses connected with Superior Implement testified that City officials, i.e., the mayor and city councilmen, made representations to them or their employees at a 20-minute private meeting that the Park would never be annexed. These statements, according to these witnesses, were made during discussions when the Burts were considering purchasing property in the Park. A fourth witness gave hearsay testimony that another person had told him that the City had made similar representations to his employee. There is no evidence that any of these representations, assuming they were made, were officially authorized by the City. Rather, these appear to have been representations made by individuals who, while involved in City government, were making them in an unofficial "chamber of commerce" capacity. Unfortunately, if they represented such things, they were wrong, although there is no evidence that they knew it at the time.

A city or county is not estopped by unauthorized conduct, representations, promises, or pledges of its officers and agents, absent official acquiescence in and approval of same by such governmental unit. *Schilke v. School Dist. No. 107*, 207 Neb. 448, 299 N.W.2d 527 (1980). The general rule is that while ordinarily a municipality may not be estopped by unauthorized conduct, representations, promises, or pledges of its officers, it may, within the limitation of its legal powers, be estopped by its official acquiescence in, and approval of, acts originally unauthorized. *Id.*, citing *May v. City of Kearney*, 145 Neb. 475, 17 N.W.2d 448 (1945). See, also, *Lee v. Ralston School Dist.*, 180

Neb. 784, 145 N.W.2d 919 (1966) (school district was not estopped from denying that contract of discharged superintendent of schools was bought by district on basis of statement made by president of school board indicating that if superintendent did not resign, board would have to buy his contract; there was no pleading or proof of any agreement to buy contract); *Nickel v. School Board of Axtell*, 157 Neb. 813, 61 N.W.2d 566 (1953) (representations were made by member of county committee at public hearing that given school district could petition out of reorganized district by petition containing names of 55 percent of legal voters without explaining that petition must be signed by 55 percent of legal voters of entire new district; these representations did not estop district officials from claiming legal existence of district in absence of evidence that electorate, or any part thereof, relied on representations in voting at special school district reorganization election). Here, none of the owners ever went before the city council to obtain an official endorsement or verification that the land was not subject to annexation. Nor did any of the owners receive such a representation from the city council. Thus, the City did not explicitly or implicitly represent to the owners that the land was not subject to annexation.

*Representations as to Law.*
 Further, even if the unofficial statements of the mayor and city councilman can be construed as binding on the City, such purported representations are representations as to the law, i.e., the legal status of the land as an "industrial area" and the City's inability to annex it pursuant to statute.

> [A] misrepresentation as to the law will not give rise to an action for fraud and deceit . . . and, therefore, cannot be said to constitute conduct which amounts to a false representation or concealment of material facts or at least which is calculated to convey the impression that those facts are otherwise than and inconsistent with those which the party subsequently attempts to assert. Absent that fact, the first element of equitable estoppel is totally lacking.

*Kohlbeck v. City of Omaha*, 211 Neb. 372, 376, 318 N.W.2d 742, 745 (1982).

*Means to Know of Truth.*

■ Finally, and perhaps the most glaring omission in the owners' proof, is that the evidence is not clear and convincing that the owners lacked the means to know the truth about the legal status of the Park land, the fourth element of equitable estoppel and the first with regard to the person seeking the estoppel. See *Inner Harbour Hospitals v. State*, 251 Neb. 793, 559 N.W.2d 487 (1997). Specifically, there is no evidence that the owners lacked the ability or opportunity to independently determine the legal status of the land before they purchased it. They obviously failed to do so. Equitable estoppel will lie only where the party asserting estoppel does not have the same knowledge of the facts that the party being estopped has, and does not have the ability to ascertain or is not chargeable with notice of those facts. *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989).

The interesting aspect of this case is that representatives of the party now sought to be estopped, the City, apparently had no more actual knowledge of the true facts than did those now seeking the estoppel, the owners. Both seemingly had an equal opportunity to determine the truth, but each failed to do so. It was not until 1995 that the Nuckolls County Attorney determined that the county board, the entity legally empowered by statute to take the last step in the process to achieve industrial area status, had not declared the area an industrial area because no one had petitioned that it do so and, thus, that the Park was subject to annexation by the City without its having to fit within one of the exceptions delineated in § 13-1115.

The evidence is undisputed that none of the owners asked for or obtained a prepurchase opinion from the city attorney as to the land's general status, specifically, whether it could be annexed. There is no evidence that the prospective owners even made an appearance before the city council to request and receive some assurance of the land's status. These are perplexing omissions when one considers the trial testimony, particularly by Superior Implement and Agrex, of how critically important the land's status was to their respective purchases. The owners claim that the only way they could have determined the legal status of the land was to solicit an independent legal opin-

ion. They did not do so. They imply that the law should not place such a burden on them as a condition to successfully employ equitable estoppel. We know of no such requirement. And while hindsight suggests that seeking a legal opinion would have been an option—and perhaps the best one—under the circumstances, it was only one option. Other are mentioned above. Another was an examination of the records of the Nuckolls County Board of County Commissioners, the governing authority of the land in question.

It is clear from exhibit 10, a 1984 letter from Superior Implement to the Superior Planning Commission, that it was aware of the proper procedure to follow if it wanted to have its land declared an industrial area. Thus, Superior Implement had determined, at least by that time, that its land was not classified as an "industrial area" pursuant to § 13-1111 et seq. and thus was not legally immune from annexation. If the true status of the land was determinable in 1984, presumably it was also determinable in 1981 when Superior Implement and Agrex bought the land.

*Summary.*

We have no significant dispute with the trial court's finding that the City set out to create an industrial area in 1977 or with its general observation that the City had enticed businesses to the area and extended a "welcome mat." But we believe it is unsound to elevate the unofficial representations made by commerce-minded city officials, even if they are members of a city's governing body, to a status such that those representations are legally binding on the city and thus all citizens of that city. To do so is a perversion of representative government in that not all councilpersons are present and speaking for their constituents on the issue.

Where, as here, the City did not, and was not asked to, officially adopt the representations and where some of its personnel were apparently proceeding under a mistaken legal belief that was just as capable of being discovered and corrected by the owners as by the City, we cannot find that this case presents circumstances that rise to the level qualifying it for an exception to the general rule against invoking equitable estoppel against a municipality, i.e., to prevent a manifest injustice. See *Willis v.*

*City of Lincoln*, 232 Neb. 533, 441 N.W.2d 846 (1989). According to the evidence, substantial tax increases will be the result of this annexation, a result which the owners understandably see as unfair. On the other hand, we expect that some citizens of the City might find it equally as unfair that the City's boundaries, and hence its tax base, were permanently restricted because of the unofficial and incorrect representations of past City officials. Nebraska Supreme Court decisions are rich in examples illustrating that equitable estoppel will not lightly be invoked against municipalities. In accordance with this precedent, we must reverse its invocation here.

## CONCLUSION

Our de novo review establishes that the owners have failed to prove by clear and convincing evidence that the City engaged in conduct amounting to a false statement or concealment of material facts. Moreover, the proof is deficient to show that the owners lacked the means of knowledge of the truth. Thus, the doctrine of equitable estoppel was erroneously applied, and the judgment of the district court is reversed and the matter remanded with directions to dismiss the petition.

REVERSED AND REMANDED.